1827ROJC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               Plaintiff,

5          v.                            11 Civ. 4139

6   ROJADIRECTA.ORG
    and ROJADIRECTA.COM,
7
                Defendant-in-Rem.
8
    ------------------------------x
9
                                       August 2,, 2011
10                                     3:45 p.m.

11  Before:

12                    HON. PAUL A. CROTTY

13                                     District Judge

14                         APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  CHRISTOPHER FREY
17       Assistant United States Attorney

18  RAGESH TANGRI
    DAVID SPEARS
19       Attorneys for Defendant-in-Rem
         Rojadirecta.org and Rojadirecta.com
20

21

22

23

24

25

1827ROJC

1              (Case called)

2              (In open court)

3              MR. FREY:  Good afternoon, your Honor.  Christopher

4    Frey on behalf of plaintiff United States of America.

5              THE COURT:  Mr. Frey.

6              MR. TANGRI:  Ragesh Tangri, your Honor, on behalf of

7    defendant.

8              MR. SPEARS:  And David Spears of Spears & Imes LLP on

9    behalf of defendants.

10             THE COURT:  OK, please be seated.

11             Mr. Frey, I have a petition here for release of the

12   materials, correct?  It was filed back in -- petition to

13   release seized property -- back on 6/13.  Then you filed your

14   verified complaint on June 17?

15             MR. FREY:  That's correct, your Honor.

16             THE COURT:  And I have a letter request of July 15

17   and -- two letter requests.  One July 15, another one is

18   updated July 19, I guess from Johanna Colabria asking for

19   authorization to move to dismiss, right?

20             MR. TANGRI:  That's correct, your Honor.  Ms. Colabria

21   is one of my colleagues, and we submitted the letter request to

22   move to dismiss.

23             THE COURT:  The question I have, Mr. Tangri, as long

24   as you are on your feet, is what does this do to the petition

25   for release of the seized property?

1827ROJC

1    MR. TANGRI:  Well, your Honor, the petition for the

2    relief of seized property is a pendente lite temporary relief

3    procedure to allow a claimant to regain its property under

4    certain conditions pending adjudication of the civil forfeiture

5    complaint.  We would respectfully request -- and that petition,

6    by the way, your Honor, is fully briefed.

7    THE COURT:  Right.

8    MR. TANGRI:  We would respectfully request that that

9    be ruled on.  If the court rules on it favorably, then the

10   property would be returned, the domain names would be returned

11   pending disposition of the civil case.  That could occur if the

12   motion to dismiss that we've asked leave to file is filed and

13   granted; it could occur later if the proceeding goes further.

14   But the motion to dismiss does not moot the petition for the

15   return of the property pendente lite.

16   THE COURT:  Do you want to argue that motion then, or

17   do you want it considered on the papers?

18   MR. TANGRI:  Your Honor, we would be happy to address

19   it today.  As I say, it's been fully briefed, and I am happy to

20   address it.

21   THE COURT:  Mr. Frey?

22   MR. FREY:  That's fine, your Honor.  It is fully

23   briefed, and I think it's ready for disposition.

24   THE COURT:  OK.  Well, Mr. Tangri, do you want to take

25   five or ten minutes and give me your points of view?

1827ROJC

1          MR. TANGRI:  Certainly, your Honor.

2          Thank you for hearing us.  I would like to start by

3    setting the framework for the 983(f) petition because it's a

4    somewhat unusual framework.  As I said, it allows for the

5    return of seized property pending the disposition of a civil

6    forfeiture action.

7          There are in broad strokes two sort of issues I

8    believe for the court to consider on this motion.  The first is

9    a balancing test, essentially balancing the hardships as one

10   might do in the more familiar context of a preliminary

11   injunction motion.

12         The hardships or the issues to be balanced under the

13   balancing test are, one, is there any risk on the one side that

14   if the property is returned to the claimant it will be

15   dissipated, transferred, taken away, flee the jurisdiction or

16   otherwise be rendered unavailable for recovery at the end of

17   the proceeding should the proceeding be resolved in favor of

18   the government.

19         On the other side of that balance is the hardship that

20   is suffered if the property remains seized while the civil

21   forfeiture action is adjudicated on the merits.  That's one

22   large issue, and I will address it in a moment.

23         The second issue is whether if the balancing test was

24   resolved in favor of the complaint, in favor of return of the

25   property pendente lite, the government can show that the

1827ROJC

1  property will be used to commit a crime if it is returned.

2  That is the second issue.  We, needless to say, think that both

3  issues fall in our favor.

4          On the balancing test I think it's important to begin

5  by observing that the government has not argued, has put in no

6  evidence and has not even briefed anything on its side of the

7  balance.  They make no argument that the domain names will not

8  be available if they are returned to my client during the

9  pendency of the proceeding.  They make no argument that they

10  will be destroyed, that they will be unavailable as evidence,

11  or that they will be dissipated or rendered beyond the

12  jurisdiction of this court in the event that they are returned

13  and then the proceeding is later concluded adversely to us.

14  They do not address those points.

15          So, there is nothing on their side of the balance.

16  Indeed, that is correct because the domain names are registered

17  through a U.S. domain name registry.  That is how and why the

18  government was able to seize them in the first place.  That

19  will not change; they will be there.  So, on the government's

20  side of the balancing, on the balancing test, there is nothing.

21          On our side of the balancing test, on the hardship

22  that is suffered if the domain names remain seized, there are

23  two broad areas of hardship.  The first is that a substantial

24  amount of speech, expressive speech, was taking place on the

25  website that these domain names point to prior to the seizure.

1827ROJC

1          THE COURT:  What was the expressive speech?

2          MR. TANGRI:  It was in the form of a user forum, sort

3    of user blogs, a chat room, if you will, in which sports fans

4    posted their impressions and commentary back and forth.

5          THE COURT:  On?

6          MR. TANGRI:  On various sporting events.

7          THE COURT:  And the sporting events were -- how were

8    the sporting events portrayed?  They are copyrighted materials,

9    aren't they?

10          MR. TANGRI:  The sporting events, your Honor, some of

11    them were copyrighted material, I'm sure, and some of them were

12    materials that may -- well, in some cases they were authorized

13    to be streamed on the Internet.

14          The sporting events themselves were not on the

15    website.  And I am perhaps jumping ahead to the second big

16    issue, which is the criminal issue.

17          But to address your Honor's question directly now, the

18    website neither hosts nor streams any infringing content or

19    copyrighted content without authorization of its own.  And

20    there is no allegation that it does.  It is what is referred to

21    as a linking website; it puts up links that one can click on.

22    That takes a user to a different website on which the material

23    may reside.

24          THE COURT:  So, you have the ball games going on in

25    one area, and then you have this running commentary?  Is that

1827ROJC

1    what you're saying?  I'm not very good at this.

2              MR. TANGRI:  Let me talk a step back.

3              THE COURT:  So, you have the citizen commentary on

4    ball games, and that's carried over on a website that has

5    nothing to do with the live streaming of the sporting event?

6              MR. TANGRI:  Correct, your Honor.  The citizen

7    commentary -- and I don't mean to suggest -- I mean I don't

8    mean to suggest that it's all contemporaneous commentary.  Some

9    of it may be wasn't that a great game last night, or didn't

10   that umpire the call at the home plate in the 19th inning of

11   the game last night, or yesterday morning.  So, I don't mean to

12   suggest it's all real time, but it is a website -- I mean

13   ESPN.com runs websites where users can comment on things, and

14   so does this.

15             That content, the user commentary, is posted to a

16   website and a server controlled by Rojadirecta.  The sporting

17   events are being streamed from or reside upon different servers

18   run by different websites in different companies that

19   Rojadirecta do not control, host or own.  It's different.

20             What Rojadirecta has on it, in addition to the

21   fan-based, fan-generated commentary are links to those

22   websites.  In the same way that if one were to go to Google or

23   any other search engine and type in a series of words that you

24   were interested in, Google puts up links in the search result

25   page, and when you click on one of those links you go to The

1827ROJC

1   New York Times, or ESPN, or the Washington Post, or the

2   Department of Justice website, but that material although

3   Google got you there isn't Google's material and it is not

4   hosted on Google's server.

5          So, returning for a moment to the hardship inquiry,

6   with the seizure of the domain names a substantial number of

7   people who previously visited the site ceased doing so, and

8   they have lost the ability to post comments on that site and to

9   read comments from other users.  They have lost in short the

10  forum through which they were engaged in this First Amendment

11  activity.  That's one form of hardship.

12         The government in its opposition said very little

13  about that.  It devoted a paragraph to it.  It made the

14  assertion that there were other places where users could engage

15  in this speech.  That does not serve to justify a prior

16  restraint or vitiate a prior restraint under the First

17  Amendment.  And in our briefs, without belaboring the point, we

18  put in cases both in the opening and the reply that address the

19  fact that this is a prior restraint and that a prior restraint

20  cannot be justified by --

21             THE COURT:  -- alternative forums.

22             MR. TANGRI:  Alternative forums, exactly.

23             THE COURT:  And what about the second reason?

24             MR. TANGRI:  The second reason -- the second hardship

25  for us is, as I mentioned a moment ago, the diminution in

1827ROJC

```
 1   traffic.  We put in evidence that traffic to our site is down
 2   substantially since the seizure, and it has not returned to
 3   pre-seizure levels; it dropped precipitously immediately after
 4   the seizure.  It has worked its way back up a little bit, but
 5   it is still down substantially from pre-seizure level.
 6           The government makes the point that there are other
 7   domain names which they have not seized that point to the same
 8   site.  That is correct.  It is also we submit not dispositive
 9   because the reality is that most people who look for websites
10   look for them under their familiar names and under first dot
11   com and then dot org, and most U.S. users are not necessarily
12   going to find it under dot ES or dot ME or some other suffix
13   that might take them there from a technical standpoint if they
14   don't know how to put it in.
15           So, it is a hardship; it is a burden.  The evidence is
16   that it has driven traffic down.  There is no contrary evidence
17   submitted by the United States to show that traffic has not
18   gone down or to show that anything else caused traffic to go
19   down.
20           Again, at the end of the day, in the balance of
21   hardships, there is a debate it seems as to the degree or the
22   severity of the hardship being suffered because of the seizure,
23   but I submit that it really cannot fairly be concluded that
24   there is no hardship being suffered.  And because there is
25   nothing on the other side of the balance, we suggest that the
```

1827ROJC

1  balance tips in our favor.

2            THE COURT:  All right.  And the second reason is if

3  one is present will the property be used to commit a crime.

4            MR. TANGRI:  Correct, your Honor.  The answer there is

5  that the property has not been used to commit a crime and will

6  not be used to commit a crime for several reasons, but let me

7  start from what I think is the clearest one.

8            The crime alleged is criminal copyright infringement.

9  Criminal copyright infringement requires a showing of willful

10 conduct.  In the context of criminal copyright infringement

11 willfulness is given the same reading as it is given in banking

12 cases and criminal tax cases.  It is a specific intent crime.

13 The government must show to establish criminal copyright

14 infringement that the actor knew the act was illegal, not

15 merely that they intended to commit an act.

16           The cases that address criminal copyright infringement

17 cite to cases such as Screws and Cheek and others in that line

18 of specific intent federal crimes, not general intent crimes.

19 And the cases specifically hold -- again these are in the

20 petition, you will have seen them -- that an intent to violate

21 the law must be shown, and knowledge of violating the law must

22 be shown.  It's not enough to say you intended to act, you must

23 have been aware that the act was criminal.

24           THE COURT:  So, your view is under this petition you

25 should get the property back pending the outcome of the

1827ROJC

1    determination on the complaint filed.

2             MR. TANGRI:  That's correct.  And if I may just say

3    one more thing on the merits of the copyright issue.  The

4    business we were talking about a few moments ago in response to

5    your question about where the content was, when I said this

6    site just links to other conduct, we have cited several cases

7    holding that even in the context of civil copyright claims,

8    merely linking to conduct that might be infringing does not

9    constitute copyright infringement.  The government did not cite

10   any cases holding to the contrary.  And we submit that for that

11   reason alone, one, there is no showing of copyright

12   infringement at all, but there cannot be a showing of

13   willfulness where the uniform authority says the conduct is

14   legal even under a civil standard, to then hold that it can be

15   willfully criminal is beyond precedent.

16            THE COURT:  Thank you very much.  Mr. Frey.

17            MR. FREY:  Thank you, your Honor.

18            Your Honor, under the law this remedy that Rojadirecta

19   seeks to use in order to obtain its website domain names back

20   is not like a preliminary injunction.  It is not a balancing

21   test.  The law is very clear that the claimant bears the burden

22   of demonstrating that the statutory prerequisites are

23   satisfied.  And Rojadirecta has not done that because it cannot

24   do that.  It cannot establish the substantial hardship that is

25   necessary under the statute.

1827ROJC

```
 1          Both the statutory text and the legislative history
 2    make very clear that what Congress was concerned with was
 3    giving back property pending the final disposition of an action
 4    in very limited situations, in situations where the functioning
 5    of a business would be prevented, where an individual wouldn't
 6    be able to go to work, where an individual would be left
 7    homeless.
 8          The hardship that Rojadirecta --
 9          THE COURT:  I think we can concede that nobody is
10    going to be made homeless.  But you have seized something now
11    from Rojadirecta, and how are they to do business without this
12    domain name?
13          MR. FREY:  Your Honor, the Rojadirecta website is
14    functional today.  It is in business.  It's located at other
15    domain names, not even name but under multiple domain names.
16    The only access that the government has deprived Rojadirecta of
17    has been through the .org and .com domain names that the United
18    States controls, that Rojadirecta registered through a
19    registrar located in Arizona.  That's all that Rojadirecta has
20    been deprived of.
21          And Rojadirecta concedes that the loss in Internet
22    traffic that it has experienced is a mere 32 percent.  It
23    speaks to the fact that the website is still very much
24    accessible, it's still being used.  It can be found merely by
25    Googling Rojadirecta.  It's available today.  It's not
```

1827ROJC

1    prohibiting the financing of their business.

2            THE COURT:  Well, what is the utility then of seizing

3    .com and .org with Rojadirecta?  I mean if it's so easily

4    available on other sites, what's the utility of your seizure of

5    it?  You are sending a message, I understand.

6            MR. FREY:  Exactly.  It's sending a message that the

7    use of such domain names that are controlled by the United

8    States are not going to facilitate criminal copyright

9    infringement, that the United States is not going to permit

10   that.  It sends a message; it has a deterrent effect.

11           THE COURT:  What is the criminal violation of the

12   copyright here?  I mean what does that consist of?

13           MR. FREY:  I'm sorry, your Honor, I guess I don't

14   understand your Honor's question.

15           THE COURT:  I phrased it inartfully.  What is the

16   violation?  What's the precise violation of the copyright

17   statute that you believe Rojadirecta.com and Rojadirecta.org

18   have engaged in?

19           MR. FREY:  That they have facilitated criminal

20   copyright infringement by linking to material that is protected

21   under the United States copyright laws.

22           THE COURT:  Now, what's protected under the United

23   States copyright laws?  It's the ball games?

24           MR. FREY:  It's the performance of the sporting

25   events.  The individual sporting leagues, the NFL, the NBA, the

1827ROJC

1     NHL, they hold the copyrights to the various sporting

2     performances, and then they enter into leasing arrangements

3     with broadcasters in which those broadcasters will televise

4     those events.

5          THE COURT:  Right.  At the Yankees they always say

6     unauthorized use is not permitted unless you talk to George

7     Steinbrenner.

8          But as I understand what Mr. Tangri told me, that's

9     handled on a separate server or separate waiver, and what he

10    does -- not what he does -- but what his company does is

11    provide a facility for sports fans like yourself, Mr. Frey, and

12    myself, to say, well, Chris, what did you think of that play?

13    Wasn't he really out at second base?  So you and I are engaging

14    in a real-time dialog about a sports event.  But the sports

15    event, it's the occasion for the speech, but it has nothing to

16    do with what the Rojadirecta.com and Rojadirecta.org are

17    providing.

18         MR. FREY:  Well, your Honor, Rojadirecta and the

19    government disagree about the nature of the website.  The

20    government did attach as one of its exhibits to the declaration

21    that was submitted in support of our opposition to that

22    petition a still photo of the website as it existed on January

23    31st of this year, setting forth the way that that home page is

24    visible to the user.  But the government submits that it is

25    disingenuous to characterize the Rojadirecta website as a chat

1827ROJC

1    forum.  To the extent there is any chatting going on in that

2    website, that's certainly secondary to what Rojadirecta aims to

3    do.  Rojadirecta adds links to various copyrighted sporting

4    events as the day progresses, so as events near in time those

5    links are posted allowing Internet users access to those

6    videos.

7            Your Honor can see from that photograph of the website

8    --

9            THE COURT:  I'm trying to find the photograph.

10           MR. FREY:  I believe it's attached.

11           THE COURT:  Exhibit A?  Exhibit B?

12           MR. FREY:  As Exhibit A, your Honor, to my declaration

13   supporting the opposition.

14           THE COURT:  Declaration of Christopher Frey in support

15   of government's opposition.

16           MR. FREY:  Yes, your Honor.  Exhibit A to that is a

17   screen shot of the Rojadirecta home page as it appeared on

18   January 31st of this year.

19           THE COURT:  Oh.  But this just looks like a chart.

20           MR. FREY:  Well, your Honor, exactly, it looks like a

21   chart because for all intents and purposes that's what it is,

22   it's a chart of links linking to the various sporting events

23   that were occurring that day.  On the left-hand side of the

24   website there is a "today on Internet TV" page, and then on the

25   right is there are options to download the last whole matches

1827ROJC

1    and video highlights.

2          As your Honor will see, the chatting -- to the extent

3    it exists -- appears to be limited to the upper left-hand

4    corner under the Rojadirecta banner where it lists forums.

5          THE COURT:  So, you focus in on the download matches?

6    Is that it?

7          MR. FREY:  It's both the "today on Internet TV"

8    portion on the left as well as the material on the right.  Once

9    one clicks on these individual links, a new window opens

10   bearing the Rojadirecta domain names and streams those

11   individual matches, those individual sporting events, which are

12   copyrighted.

13         They were seized after Judge Maas found probable cause

14   to believe that Rojadirecta was in fact engaged in criminal

15   copyright.  It's not chatting that's going on on this site;

16   it's criminal copyright infringement.

17         Rojadirecta simply can't establish a substantial

18   hardship that they need to show in order to allow for the

19   immediate return of the property.

20         To characterize or attempt to characterize Rojadirecta

21   as a search engine, something like Google, is disingenuous.

22   The links are being constantly updated in a targeted and

23   purposeful way.  It is simply not an avenue for one to go and

24   search for things that happen to be out on the Internet.  It

25   brings them all together in a very purposeful manner.

1827ROJC

1        And as our opposition demonstrated, the government

2   believes that Rojadirecta was in fact engaged in willful

3   criminal copyright infringement.

4        THE COURT:  Do you agree with Mr. Tangri's definition

5   of willful?

6        MR. FREY:  I believe that we would have to establish

7   that they knew that the conduct was illegal.  And here we have

8   shown -- as the declaration also offers an example of, Exhibit

9   B to my declaration -- that over and over again Rojadirecta

10  received so-called take-down notices, informing Rojadirecta

11  that it was in violation of the various copyrights and asking

12  it to cease its activity.  It was put on notice; it ignored

13  those.

14       For all of those reasons, your Honor, the government

15  would request that you deny the petition and that we move

16  forward with the civil forfeiture complaint.

17       THE COURT:  Mr. Tangri, do you want to have a brief

18  response?

19       MR. TANGRI:  Yes, please, your Honor.  Thank you.

20       On the balancing test, that comes straight from the

21  statute.  It's 983(f)(1)(D).  That's where the statute says one

22  should balance.

23       On the severity of the hardship that has to be shown,

24  the statute does not by its terms require severe hardship.  It

25  gives one example of something that would be a severe hardship,

1827ROJC

 1  but it simply says hardship, and it then directs the balancing,

 2  as I said.

 3              Mr. Frey acknowledges, he says, a mere 32 percent --

 4              THE COURT:  Well, I noticed that, but 32 percent is a

 5  lot.

 6              MR. TANGRI:  Yeah, it's another way of saying one

 7  third, and most businesses if they lost one third of their

 8  business would be troubled and they would be suffering a

 9  hardship.

10              And again your Honor pointed this out, but there is a

11  little bit of you can't have it both ways here.  I mean if

12  there is a purpose to doing this, and if there is a reason for

13  the government to believe it is justified in keeping these

14  domain names, then it must be because they think that it is in

15  some way impeding the operation of the site.  And, in fact, as

16  the numbers demonstrate, it is.

17              To respond briefly to a couple other points that Mr.

18  Frey made reference to another window opening and the streaming

19  content then appearing.  Their papers acknowledge several

20  points:  That streaming content is coming from another site.

21  Just as when you are -- I don't know if your Honor uses Google

22  News -- if you click on a link in Google News to a news story,

23  often a new window appears, that window, that content is coming

24  from The Washington Post, the Detroit Free Press or whatever

25  paper story you are clicking on; it's not coming from Google,

19

1827ROJC

1    although it arises from clicking on a link in Google News.

2            Back to the search engine analogy, Google News is a

3    good example.  It is part of Google.  It's is search engine.

4    It in real-time aggregates and selects content that it believes

5    is going to be of interest to its users; it puts them up on the

6    front page.  But you can also search for any other content, and

7    whatever you find you go to contest hosted by somebody else.

8            THE COURT:  Let's carry that forward, Mr. Tangri, into

9    what Rojadirecta does.  Assuming it is like Google, can I click

10   on Google and get an unauthorized baseball game or basketball

11   game?  What would my rights be as against -- I mean what would

12   the government do if Google were to give you access to

13   unauthorized rebroadcast of a football game or basketball game?

14           MR. TANGRI:  Your Honor, Google -- I think they

15   might -- well, let me answer that.  If you search on Google for

16   certain content, I believe you can find it unless Google has

17   for its own reasons taken it down.  And I think there is an

18   ongoing sort of up and down and up and down, but it is not I

19   don't think in any way impossible to locate on Google or on any

20   other search engine on the Internet the same content that you

21   can locate via Rojadirecta.  It is out there and search engines

22   will lead you to it if you look for it.  There is no reason

23   that would not be the case.  The government -- I will let the

24   government speak for what the government will do with it or

25   what it's doing vis-a-vis --

1827ROJC

1          THE COURT:  That wouldn't be aiding and abetting

2     copyright violations?

3          MR. TANGRI:  So, your Honor, a couple words on aiding

4     and abetting, so I'm glad you brought it up.

5          Aiding and abetting is not a crime for which

6     forfeiture -- one, it's not the crime pled in the complaint,

7     and, two, it's not a crime for which forfeiture lies under this

8     forfeiture statute.  The crime for which forfeiture lies under

9     this statute is criminal copyright infringement.

10          Now, in the civil copyright infringement realm there

11     are civil claims for what is sometimes called indirect

12     infringement or secondary infringement.  Contributory

13     infringement is a particular species.  Vicarious infringement

14     is a particular species.  Those are common law creations, and

15     the criminal copyright statute does not pick them up.  Our

16     position is that there are not common law adumbrations on or

17     penumbras around crimes.  The existence of the aiding and

18     abetting statute, it is there but it is expressly not included

19     among the crimes for which forfeiture lies under the forfeiture

20     statute that the government is proceeding under, and that's I

21     think why there is no claim in the civil forfeiture complaint

22     for aiding and abetting.

23          I also think on the merits it would not be shown to be

24     aiding and abetting.  Because of the general purpose nature of

25     the site, the fact that it's used for many other things,

1827ROJC

1    wouldn't certainly constitute contributory copyright

2    infringement in a civil case because it is adapted for many

3    other purposes.

4          And to get back to the other purposes for a moment,

5    Mr. Frey showed you the screen shot.  I am sure your Honor

6    appreciates this, but that's a screen shot of one page of a

7    website that has many, many pages to it.  And as you did point

8    out, the very uppermost left-hand link is forums, and as you

9    click on that link it takes you to all of the discussion forums

10   and all of the various expressive speech that's happening.

11         THE COURT:  What if I'm not interested in the

12   discussion forums, I'm really more interested in the sports?

13         MR. TANGRI:  Well, then if you click on one of the

14   sporting links you may go to a broadcast that's hosted on some

15   other website by some other actor.

16         THE COURT:  And your client bears no responsibility

17   for that?

18         MR. TANGRI:  Our client does not originate

19   unauthorized content, and there is not an allegation that it

20   does.  The allegation is that this is a linking site.  The

21   government's papers and the special agent's affidavit contain a

22   discussion of what is a linking site, and they are express

23   about the fact that it links to conduct hosted by, created by,

24   put there by somebody else on some other website, maintained by

25   some other actor.

1827ROJC

 1          THE COURT:  Thank you very much.

 2          MR. TANGRI:  Thank you, your Honor.

 3          THE COURT:  Mr. Frey and Mr. Tangri, do you want this

 4   matter resolved first before we take up the verified complaint

 5   that Mr. Tangri and Ms. Calabria want dismissed?  What's the

 6   best approach here?

 7          MR. TANGRI:  Your Honor, if I may answer, I would

 8   respectfully submit that the 983(f) petition has now been fully

 9   briefed and argued, and we would respectfully request that the

10   court rule on it.

11          We would also request that we be allowed to go ahead

12   and file a motion to dismiss, because, as I said, even if you

13   rule in our favor on the 983(f) and we get the domain names

14   back, we still face a forfeiture proceeding and I believe one

15   that is defective on its face.

16          THE COURT:  Without suggesting what my ruling is going

17   to be, I mean why am I doing that if I can give you leave to

18   file your motion to dismiss and I address that promptly?

19          MR. TANGRI:  Well, your Honor --

20          THE COURT:  Why am I doing the same work twice or

21   slightly different work twice?

22          MR. TANGRI:  I guess what I would say is if the motion

23   to dismiss I suspect is going to take a little while -- we are

24   prepared to file our motion this week.  I mean we're ready to

25   go.  I expect the government, I don't know how long they are

1827ROJC

1    going to want to oppose it.

2              THE COURT:  Well, ask Mr. Frey.  He seems to be an

3    accommodating gentleman.

4              When would you file it, Mr. Tangri?

5              MR. TANGRI:  We could file it on Thursday, your Honor.

6              THE COURT:  OK.  So, assuming we do that.  We will do

7    it on Friday the 5th.  It's easier to calculate.

8              Mr. Frey, how much time do you need to respond?

9              MR. FREY:  Your Honor, the government would like three

10   weeks, which I believe would take us to August 26.

11             THE COURT:  OK.  So, I mean it will be fully briefed

12   then shortly after Labor Day.

13             MR. TANGRI:  That's correct, your Honor.  And I mean

14   the website has been seized now since January 31.

15             THE COURT:  Yes.  But you didn't make your motion

16   until when?

17             MR. TANGRI:  We didn't make our motion until June,

18   your Honor, because -- this is an important point and I'm glad

19   you raised it -- we didn't make our motion because we were

20   making I think what everyone would agree were serious efforts

21   to reach a compromise.

22             THE COURT:  There is reference to that in somebody's

23   papers that I read.  I guess it would be yours, Mr. Frey.  You

24   refer to it.

25             MR. FREY:  I think both, your Honor.  I mean that's

1827ROJC

```
 1   absolutely correct.  Those discussions ultimately broke down.
 2   The defendants were unwilling to remove copyright-protected
 3   material from their website.
 4               THE COURT:  I'm not interested in that.
 5               MR. TANGRI:  I would prefer not to get into the merits
 6   of the discussions, because I --
 7               THE COURT:  I agree.
 8               MR. TANGRI:  -- But I will say, your Honor, we were
 9   proceeding down a path, and we thought there was room for
10   compromise, and in the end it turned out there was not, and I
11   think it would be regrettable if we were sort of punished, if
12   you will, for trying to work this out without burdening the
13   court system and then be told we slept on our rights.
14               THE COURT:  The point of my raising it is I have known
15   about this only for a couple weeks.
16               I understand the urgency of it, and I will try to
17   press ahead as quickly as possible.  In the meantime, you want
18   to make the motion that you have sought permission to make on
19   July 19, you want to make that by this Friday?
20               MR. TANGRI:  Yes, your Honor, we shall.
21               THE COURT:  And then three weeks after that we will
22   get Mr. Frey's response.
23               MR. SPEARS:  Your Honor, may I confer with Mr. Tangri
24   for one second?
25               THE COURT:  Sure.
```

1827ROJC

1          MR. TANGRI:  So, your Honor, if I understand

2     correctly, we will file the motion to dismiss on the schedule

3     given, and it will be opposed.  Are we permitted a reply?

4          THE COURT:  You are permitted a reply.  You want a

5     reply on the Friday before Labor Day Weekend, or would you like

6     to have it a little bit later?

7          MR. TANGRI:  No, we will reply the Friday before Labor

8     Day Weekend, that's fine.

9          THE COURT:  OK.  So, the schedule then is the 5th for

10     your motion, the 26th for the response, and the 2nd of

11     September for your reply.

12          MR. TANGRI:  Very well.  And we would, as I am sure

13     you know, because I am saying over and over, and I apologize,

14     but we respectfully request that to the extent there is room on

15     the court's docket to move forward with the petition while this

16     is being briefed by the parties, we submit they are on

17     different tracks.

18          THE COURT:  All right, fine.  I appreciate the

19     argument today; it helped to clarify the issues for me.

20          MR. TANGRI:  Thank you very much, your Honor.

21          THE COURT:  Anything else, Mr. Frey?

22          MR. FREY:  No.  Thank you, your Honor.

23          MR. TANGRI:  No, your Honor.  Thank you.

24          THE COURT:  Thank you, Mr. Tangri.  Thank you,

25     Mr. Spears.