```
17seserc
```

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  SERVAAS INC.,

4              Plaintiff,

5        v.                           09 CV 1862(RMB)

6  REPUBLIC OF IRAQ, et al.,

7              Defendants.

8  ------------------------------x

9                                    July 28, 2011

10                                   9:15 a.m.

11

   Before:
12
                   HON. RICHARD M. BERMAN,
13
                                      District Judge
14
                        APPEARANCES
15
   LOEB & LOEB, LLP
16      Attorneys for Plaintiff
   BY:  JOHN PISKORA
17
   STEPHEN PLOPPER
18      Power of Attorney for Plaintiff SerVaas, Inc.

19 MAGGS & MCDERMOTT, LLC
       Attorneys for Defendants
20 BY:  TIMOTHY B. MILLS

21

22

23

24

25

17seserc

1           (In robing room)
2           THE COURT:  Director General Nassef, is that you on
3   the phone?
4           MS. NASSEF:  Yes.  Good morning.
5           THE COURT:  Well, we have a terrible connection and
6   it's very difficult to hear you.  Can you hear us?
7           MS. NASSEF:  Yes, your Honor.
8           THE COURT:  So, well, I'm just afraid that it's --
9   like I say, it's almost impossible for us to hear you.  There
10  seems to be a bad line.
11          MS. NASSEF:  (Inaudible)
12          THE COURT:  Your voice is what?
13          MS. NASSEF:  (Inaudible)
14          THE COURT:  We can't understand really hardly anything
15  that you're saying.  We hear that you're there, but what you're
16  saying --
17          MS. NASSEF:  (Inaudible)
18          THE COURT:  I'm afraid we can't understand anything.
19  It's not your language.  It's something wrong with the phone
20  connection.
21          MS. NASSEF:  Okay.  If you want to call again.
22          THE COURT:  Sure.  Yep.  Why don't you do that.  That
23  would be helpful, okay?
24          MS. NASSEF:  Okay.  I will.  Thank you very much.
25          THE COURT:  So why don't we just talk and understand

1   where things are here.  We have both sides represented.  And
2   how are we going to resolve this is really what I want to know.
3            MR. PISKORA:  I would love to -- it's been 20 years.
4   I would love to get to the point of some sort of satisfaction
5   of the underlying judgment, or even a compromise.
6            THE COURT:  Sure.  Makes sense.
7            MR. PISKORA:  And following our last appearance
8   counsel did reach out to each other and engage in some
9   correspondence and calls about settlement.
10           THE COURT:  Right.
11           MR. PISKORA:  And so, you know, there is a sort of
12  parallel English proceeding --
13           THE COURT:  Yep.
14           MR. PISKORA:  -- in which assets have been frozen.
15  And it's currently --
16           THE COURT:  How much?
17           MR. PISKORA:  Sufficient to satisfy the judgment in
18  full.
19           THE COURT:  In full?
20           MR. PISKORA:  Yes.  The problem from plaintiff's side
21  is that there was a ruling at the trial level that the assets
22  were nonetheless protected under the English equivalent of sort
23  of sovereign immunity.  And that is currently on appeal, and
24  it's been argued, and I guess we're waiting for a decision.
25  And if we don't get a decision in the next two days, the

1   appellate court goes on summer holiday for a couple of months.
2           THE COURT: Well, what's the end game of that
3   proceeding; to get money, right?
4           MR. PISKORA: Yes.
5           THE COURT: So why do we need two cases going? And
6   not only need, but why is it even appropriate to have two cases
7   going if --
8           MR. PISKORA: I'm not sure that we even need one case.
9   I mean, I would have liked to --
10          THE COURT: I don't know that you're hearing me. You
11  sued there. The money is there in England, and you're in the
12  process of litigating whether you're entitled to it and how
13  much. Why isn't that sufficient?
14          MR. PISKORA: Well, it's not sufficient, because, as
15  the rulings of the English court currently stand is that
16  plaintiff is not going to get that money.
17          THE COURT: Well, so you don't like the outcome, is
18  really the point.
19          MR. PISKORA: No. The point is that when you get into
20  these types of cases, where you have a judgment and it's a
21  substantial judgment, you have to go out and find the asset.
22          THE COURT: Well, you found it.
23          MR. PISKORA: Well, we found an asset. It's not the
24  asset just yet. We think that they're --
25          THE COURT: You found an amount of money that's more

17seserc

1  than sufficient to cover the judgment.
2              MR. PISKORA:  Correct.  We think that there --
3              THE COURT:  And what have you found here?
4              MR. PISKORA:  Well, we're not even at that stage yet.
5              THE COURT:  I understand.
6              MR. PISKORA:  And one of the reasons that plaintiff is
7  obviously seeking some sort of compromise is that, you know,
8  we're going to go through plenty more briefing even to get to
9  that stage.
10             THE COURT:  Right.
11             MR. PISKORA:  Getting back to our conversations about
12 settlement, we made a demand to settle the judgment, or
13 compromise the judgment.  There was some issue about a UN
14 recovery, recovery through the UN.  We said, oh, we'll credit
15 that, and we somewhat discounted the judgment and made that
16 demand.  And in response -- and Mr. Mills can speak to it more
17 if you don't understand it -- but in response, we basically
18 have two hurdles, I think, to having a productive settlement
19 discussion, the first being that the Republic of Iraq has set
20 up a sort of governmental system, department or something, and
21 it's run by Ernst & Young, if I'm not mistaken, whereby people
22 who have these Saddam Hussein government era judgments or debts
23 can submit them to get some sort of recompense.
24             The problem I think from plaintiff's point of view is
25 that that program pays 10 cents or maybe 20 cents on the

17seserc

1  dollar, and that's not going to do it for us.  So we're aware
2  of that program.  In any event, we don't care to submit the
3  judgment to that program for any sort of recovery.
4          The second issue I think that the Iraqis conveyed that
5  they had, and I'm not sure that it's -- we agree that it's an
6  issue, is that they settled a lot of their sovereign debt
7  following the Kuwait war in one of these --
8          (Interruption)
9          THE COURT:  Director General Nassef, is it?
10         MS. NASSEF:  Yes.  Good morning.
11         THE COURT:  Can you hear us?
12         MS. NASSEF:  Yes, I can hear you.
13         THE COURT:  Okay.  We hear you, I guess, a little bit
14 better.  It's not a great line anyway, but I think we'll keep
15 you and try it this way, okay?
16         MS. NASSEF:  Okay.
17         THE COURT:  So the plaintiff's lawyer is going through
18 a discussion of where the plaintiff in this case stands.  And
19 we also have a transcript of everything that's said.  So you
20 can get that from Mr. Mills, and you'll know exactly what was
21 discussed here after the conference is over.
22         MR. PISKORA:  So I was saying that following the
23 Kuwaiti war, Iraq had settled a substantial amount of its
24 sovereign debt and the US debt and other sovereign country debt
25 in an agreement in a court called the Paris Club Agreement.

1           THE COURT:  I'm familiar with all that.  So I'm really
2    trying to get to the bottom line.
3           MR. PISKORA:  So the bottom line of that is that the
4    Republic took the position with us that it couldn't pay more
5    than what they had settled their sovereign debt for, which was,
6    again, the 10 or 20 cents on the dollar, which, again, from
7    plaintiff's point of view didn't get the conversation started.
8    So other than those two explanations, we never really received
9    like a monetary counteroffer.
10          THE COURT:  Okay.  Let's hear from --
11          MR. MILLS:  Yes, your Honor.
12          THE COURT:  And this is your client on the phone?
13          MR. MILLS:  This is my client, that's correct.
14          THE COURT:  Can you hear him?  Ms. Nassef?
15          MS. NASSEF:  (Inaudible)
16          THE COURT:  You what?
17          MS. NASSEF:  The person who just had been talking for
18   a few minutes, I couldn't hear him very well.
19          THE COURT:  I see.  Well, all right.
20          MR. MILLS:  I'll speak up.
21          THE COURT:  So your attorney is about to speak,
22   Mr. Mills.  And as I said before, I think you're going to have
23   to look at the transcript of this conference and then you'll
24   see exactly what everybody said.  All right?
25          MS. NASSEF:  Okay.

1          MR. MILLS:  Yes, your Honor.
2          In receiving plaintiff's settlement offer, that was
3  presented within the government of Iraq all the way up to the
4  counsel at minister level.  Other claims also were on the
5  table.
6          THE COURT:  From other people?
7          MR. MILLS:  From other people.
8          THE COURT:  So there must be a whole process and a
9  whole series of claims.
10          MR. MILLS:  There is a process indeed, and it was
11  established in 2005, 2006, to deal with these.  There are
12  binding obligations of the government of Iraq to the Paris Club
13  for proportionality.
14          THE COURT:  Right.
15          MR. MILLS:  After this offer was received, queries
16  were made of Paris Club as to whether such offers which
17  compromise claims at less than might be recovered when assets
18  are subject to attachment could be compromised without
19  violating proportionality.  We provided the Court with the
20  Paris Club's correspondence, saying, no, if you do that, you
21  subject yourself to us abrogating the agreements.  And you
22  would then be -- you, Republic of Iraq, would be liable for
23  billions of dollars of compromised debt.
24          THE COURT:  So what's your sort of dollar figure which
25  shall --

17seserc

1           MR. MILLS:  10.25 percent of the claim.
2           THE COURT:  That's it?
3           MR. MILLS:  That's what Paris Club would accept as
4  proportional on these contract claims.
5           THE COURT:  I see.  And that doesn't work for you?
6           MR. PISKORA:  We kind of understood that and reduced
7  it to a dollar amount and said no.
8           THE COURT:  Okay.  But you don't have any -- you know,
9  so you have no money.
10          MR. PISKORA:  Correct.
11          THE COURT:  And I don't know what prospect you have
12 for any money, apart from what he's suggesting.  And so I don't
13 exactly understand, other than some level of futility here, and
14 you know, jimmying up the legal business, I don't exactly know
15 where you're going.
16          MR. PISKORA:  Well, I mean, you make a fair point.
17          THE COURT:  Well, it's an obvious point.  It's not
18 brilliant, I promise you that.  You know, it's very obvious,
19 you know.  You know the expression about blood from the stone?
20 That's pretty much where it sounds like you are.
21          MR. PISKORA:  But this is a very rich stone.  It's not
22 a poor stone.  And one of the major impediments to collection
23 for the past who knows how many years, 12 years or so, have
24 been these UN initiated and US endorsed protections over Iraqi
25 assets.  Those protections evaporated on June 30th.

17seserc

So the landscape has totally changed. I mean, they're still -- I agree, there are certain protections of the Foreign Sovereign Immunities Act, but, you know, we can deal with that once we've had the judgment recognized and had discovery on available assets.

MR. MILLS: Your Honor, Iraqi assets, Central Bank assets in the United States continue to be protected under the International Economic Powers Act. The president's determination about the continuing emergency as it stands now, that continues through May of 2012, subject to the president renewing it.

THE COURT: Where is your client?

MR. PISKORA: Indianapolis.

THE COURT: How old is he?

MR. PISKORA: He's 93.

MR. PLOPPER: Ninety-two.

THE COURT: What does he feel? Wants to keep fighting --

MR. PLOPPER: He will keep fighting, yes. He undertook this project --

THE COURT: Why isn't he here?

MR. PLOPPER: Because he's 92. We wanted to have him by phone. He just recently had a physical setback, was in the hospital. I'm here under a power of attorney from him. I've been his attorney for almost 40 years now and --

17seserc

1           THE COURT:  And he pays all your legal fees?
2           MR. PISKORA:  Correct.
3           THE COURT:  And yours?
4           MR. MILLS:  And mine, and the fees in the UK.
5           If I could address your --
6           THE COURT:  How much do you think he's paid in legal
7   fees?
8           MR. PLOPPER:  In chasing this judgment?
9           THE COURT:  Yes.
10          MR. PLOPPER:  Over $3 million.
11          THE COURT:  All right.  Do you think that's sensible?
12          MR. PLOPPER:  Yes.
13          THE COURT:  You do?
14          MR. PLOPPER:  Absolutely.  I mean, we received a
15  judgment in 1991 through first the International Court of
16  Arbitration, then the French --
17          THE COURT:  I know all about it.  We had motion
18  practice in this case.  But I'm just trying to figure out --
19  you say absolutely it's sensible.  So '91, and now it's, what,
20  20 years later?
21          MR. PLOPPER:  Yes.
22          THE COURT:  And you haven't got a dime, right?
23          MR. PLOPPER:  Well, we collected in the Netherlands in
24  1992.
25          THE COURT:  Oh, I forgot.

1             MR. PLOPPER:  Before the -- before --
2             THE COURT:  Right.  How much did you collect there?
3             MR. PLOPPER:  We got a little bit less than
4    $1 million.
5             THE COURT:  So you've spent 3 million and you've got
6    1 million?
7             MR. PISKORA:  No.  They collected I think over
8    6 million from the --
9             THE COURT:  Elsewhere?
10            MR. PISKORA:  From the UN.
11            THE COURT:  From the UN, okay.  So you've got
12   7 million, so that's?
13            MR. PISKORA:  Four million left to go.
14            MR. MILLS:  On the principal amount?
15            MR. PLOPPER:  No, your Honor.  I think the 20 years is
16   part of why I'm sure he will keep going.  I know him quite
17   well, but he undertook this --
18            THE COURT:  I'm trying to understand the logic.
19            MR. PLOPPER:  Well, the logic is --
20            THE COURT:  You know, I don't mean to be
21   disrespectful, but it's unlikely that he's got another 20 years
22   to fight this case, isn't that right?
23            MR. PLOPPER:  That's correct.
24            THE COURT:  Right?
25            MR. PLOPPER:  That's correct.

1       THE COURT: So I'm trying to figure out what the end
2  game is here. You, do you get the claim after he -- if he
3  dies, or does he have family or what?
4       MR. PLOPPER: He has family. He has a corporation
5  that undertook this project way back in 1988 that is ongoing.
6  But I think the attitude at least that we've adopted is that we
7  have a valid enforceable judgment.
8       THE COURT: Well, of course you have that. Otherwise
9  you wouldn't be suing everywhere, right?
10      MR. PLOPPER: That's correct.
11      THE COURT: So if you thought it was not valid or not
12 enforceable -- excuse me. If you thought it was not valid and
13 not enforceable, we wouldn't be sitting here. So you're just
14 telling me the obvious. But I'm not hearing, you know --
15      MR. PLOPPER: Well, the obvious is that Iraq is now
16 engaging in commerce again. There are commercial assets
17 around, okay, that will fit within the sovereign immunity
18 exceptions in various jurisdictions. It's a matter of finding
19 them and enforcing against them. That's why we're here.
20      When you asked, the case in the UK is all boiled down
21 strictly to -- and I sat through a torturous argument with some
22 barristers at $1,000 an hour talking about choices in action,
23 and believe me it was painful, but it's all boiled down to --
24      THE COURT: This is a little painful, I'd have to say.
25      MR. PLOPPER: Absolutely. But it's boiled down to

17seserc

1  there a discussion of the asset itself and whether or not it
2  fits within the commercial exception.
3            THE COURT:  Right.
4            MR. PLOPPER:  I would think that the same thing would
5  occur here if we find an asset --
6            THE COURT:  Excuse me.  You mean with a different
7  result?  You think it's possible to have one result here and a
8  different result in London?
9            MR. PLOPPER:  Quite possibly.
10           THE COURT:  Why?
11           MR. PLOPPER:  Absolutely, sir.  Because I think that
12  the argument boils down -- the end game, to the asset itself
13  and what it is, how it was generated, what its purpose is.  Is
14  it for a true commercial purpose or is it for a state purpose
15  that is protected?  And if we find the right asset to attach
16  and can prove that it is commercial, it fits within the
17  sovereign immunity exceptions.
18           THE COURT:  You agree with that?
19           MR. MILLS:  It's a test on an asset-by-asset basis,
20  your Honor.  And I'm not aware of any assets in the United
21  States that are attachable or that will be attachable, even if
22  the judgment is recognized.  I'm not saying that -- you know,
23  what discovery will show, you know, a year from now, six months
24  from now, 30 days from now, whenever it's ordered.  What I'm
25  saying is what my state of the knowledge is now.

1           THE COURT:  I see.  Okay.  So what do you want to do?

2           MR. PISKORA:  Well, what I've gathered from my
3   conversation with Mr. Mills is that it's not productive for us
4   to discuss settlement further.  We've kind of reached an
5   impasse.

6           THE COURT:  Do you think that's right, Mr. Mills?  Is
7   there any room for maybe to mediate or something like that?

8           MR. MILLS:  Your Honor, unless the Paris Club relents,
9   I do not believe that the position will change.  It's a matter
10  for the Paris Club to say that particular settlements are not
11  violative of the proportionality agreement or proportionality
12  clause of the sovereign debt compromise agreement.  And if they
13  say it doesn't violate proportionality, then --

14          THE COURT:  You have room.

15          MR. MILLS:   -- we have room, but that's not -- but
16  the 10.25 percent offer is available to SerVaas at any time
17  that they wish to avail themselves of it.

18          THE COURT:  Got you.  Okay.  So what do you want to
19  do?

20          MR. PISKORA:  So I think the second part of the
21  purpose of this conference is we had asked for leave to file a
22  summary judgment motion.

23          THE COURT:  Okay.  When do you want to file that by?

24          MR. PISKORA:  Well, Mr. Mills and I have had some
25  discussions about that and have agreed to a briefing schedule.

1           THE COURT:  Which is?
2           MR. PISKORA:  Which was that the moving brief would go
3    in on August 15th.  The opposition brief would go in on
4    October 3rd, which is a Monday.  And the reply brief would go
5    in on October 17th, which is two weeks later, Monday.
6           THE COURT:  Okay.  The page limits that we have in the
7    individual rules apply.
8           And I take it we can do this motion on submission?
9    Does that work for you all?
10          MR. MILLS:  Your Honor, as to the page limits, I'd
11   like to reserve the opportunity to ask for --
12          THE COURT:  You can ask, but they're virtually certain
13   not to be changed.
14          MR. MILLS:  All right.  And whether it's on submission
15   or not, I won't know until I see the papers.
16          THE COURT:  Okay.
17          MR. PISKORA:  Fair enough.
18          One thing that I did want to try and address today as
19   far as the motion was concerned is, you know, sometimes we use
20   these conferences to cut to it, you know.
21          THE COURT:  I've been trying.
22          MR. PISKORA:  Well, unfortunately we couldn't do that
23   on the settlement front, but perhaps we can make some progress
24   on the motion front.
25          Now, from sort of plaintiff's point of view, you know,

1  we had put in our premotion letter, and you had asked for
2  replies from the defendants, and there was a reply by the
3  Republic.  Let's put them aside for a minute.
4              There was no reply by the ministry.  And I think that
5  the ministry really has no defense to the recognition of this
6  judgment, which is as against the ministry.
7              THE COURT:  That would be Ms. Nassef, right?
8              MR. PISKORA:  Correct.  Well, I believe that she
9  speaks for both.  She's from the Ministry of Justice.
10             THE COURT:  Ms. Nassef, can you hear him?  He's
11 speaking particularly about you and the ministry at the moment.
12 Can you hear him?
13             MS. NASSEF:  Look, (inaudible).
14             THE COURT:  Did you understand that?
15             MR. MILLS:  I think she said she could not hear him
16 very well.
17             THE COURT:  Oh.  Well, you don't represent her?
18             MR. MILLS:  I do.
19             THE COURT:  Okay.  So --
20             MS. NASSEF:  Listen, I know --
21             THE COURT:  You know, unfortunately, we're having a
22 difficult time hearing you still, even on this second call.
23 It's too bad, because it would be interesting to hear your
24 position, but it's not working.  And so I guess you're going to
25 have to rely principally on Mr. Mills to tell you --

17seserc

1           MS. NASSEF:  Okay.

2           THE COURT:  -- what happened here, and also on the
3  transcript of these proceedings, to know exactly what people
4  discussed.  Just too bad.

5           So anyway, the motion, the defense would be a joint
6  motion.  We wouldn't have separate motions for different
7  defendants.  So it would be a joint opposition and --

8           MR. MILLS:  That's what we contemplated, your Honor.

9           THE COURT:  So, you know, I don't really know what
10 else to say.  I don't know if that covers your point or not.

11          MR. PISKORA:  I think what I was trying to get at is,
12 is there any real argument as to the ministry, and is that
13 something that needs to be briefed?

14          THE COURT:  I don't know.  I mean, I guess you'll see
15 after you file your motion.  I mean, it's hard to ask
16 Ms. Nassef, as you hear, if she has a position on that.  Maybe
17 Mr. Mills does.  I don't know.

18          MR. MILLS:  Well, your Honor, the process internal
19 with the government of Iraq for my taking authority is papers
20 come, we submit them and we take authority.  So I don't have
21 authority to speak on any issue related to the motion until I
22 receive the motion.

23          THE COURT:  Well, that makes sense.

24          MR. PISKORA:  Okay.

25          THE COURT:  So I think that's it, right?

SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

17seserc

1          So Ms. Nassef, we just set a schedule for a motion to
2     be filed by the plaintiff on August 15 and a response by your
3     side by October 3rd and a reply by October 17.  So I guess
4     we'll see everybody's position once that motion is submitted.
5     All right?
6          MS. NASSEF:  Okay.
7          THE COURT:  And I suppose in the motion, or I assume,
8     or I would like, in any event, that you'll include the status
9     of other proceedings, such as the London proceeding, and any
10    collection that you have made in other jurisdictions.
11         MR. PISKORA:  Absolutely.
12         THE COURT:  Okay?  All right?  So, I'm sorry,
13    Ms. Nassef, but -- well, I'm just sorry that the line couldn't
14    have been any clearer.
15         MS. NASSEF:  It's okay.  Thank you very much.
16         THE COURT:  Thank you.  All right.  So we'll see you
17    all.  Thanks.
18         (Adjourned)
19
20
21
22
23
24
25