PREET BHARARA
United States Attorney for
the Southern District of New York
By:   CHRISTOPHER D. FREY
      ANDREW D. GOLDSTEIN
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2270/1559

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA             :    VERIFIED AMENDED
                                          COMPLAINT
                                     :
           -v.-                      :    11 Civ. 4139 (PAC)
                                     :
THE FOLLOWING DOMAIN NAMES:          :
                                     :
ROJADIRECTA.ORG, and
ROJADIRECTA.COM,                     :

           Defendants-in-rem.        :

- - - - - - - - - - - - - - - - - - x

        Plaintiff United States of America, by its attorney,

Preet Bharara, United States Attorney for the Southern District of

New York, for its verified amended complaint alleges, upon

information and belief, as follows:

## I.   JURISDICTION AND VENUE

        1.   This action is brought by the United States of

America pursuant to Title 18, United States Code, Section 2323

seeking the forfeiture of the following domain names:

ROJADIRECTA.ORG and ROJADIRECTA.COM (collectively the "Defendant

Domain Names"), both of which were seized on February 1, 2011.

2.   This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

3.   Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the Southern District of New York and the Defendant Domain Names were all accessed using computers within the Southern District of New York.

4.   The Defendant Domain Names were seized by the U.S. Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE"), pursuant to seizure warrants obtained in the Southern District of New York and authorized by the Honorable Frank Maas, United States Magistrate Judge, on January 31, 2011.

II.   THE DEFENDANT DOMAIN NAMES ARE FORFEITABLE PROPERTY

### Law Enforcement's Investigation

5.   Between December 2010 and February 2011, ICE agents conducted an investigation into a number of different websites that were illegally distributing copyright-protected content, namely by streaming live sporting event telecasts and/or Pay-Per-View events over the Internet without authorization.

6.   Generally speaking, illegal streaming of copyright-protected content is accomplished in one of three principal ways: (1) individuals capture the output of a television or set-top box and direct that output to a computer, where it is simultaneously

and continuously encoded and uploaded in a "stream" to so-called illegal streaming websites; (2) individuals hack the authorized Internet streams of international rightsholders and then direct those streams to illegal streaming websites; or (3) a camcorder is pointed at a television or computer screen to capture the desired programming, which is then encoded and uploaded to illegal streaming websites.

7.   The holder of the copyrights to all television broadcasts and other footage of a particular athletic event is the associated individual sports league.  The sports leagues relevant to this amended complaint are the National Football League (the "NFL"), the National Basketball Association (the "NBA"), the National Hockey League (the "NHL"), World Wresting Entertainment (the "WWE") and Ultimate Fighting Championship (the "UFC") (collectively, the "Leagues").  The U.S. Copyright Act, Title 17, United States Code, Sections 101, et seq., gives the holder of such copyrights various exclusive rights, including the right to control public performances, and the rights to reproduce and distribute their works.  In turn, the Leagues enter into contractual arrangements with television networks such as NBC and ESPN, which pay the Leagues fees for the rights to broadcast telecasts of their copyrighted sporting events.

8.   The Leagues suffer significant negative impact from the unauthorized streaming of live television programming.  Among

other things, online piracy of live sporting event telecasts threatens the investment that broadcasters and digital media companies are willing to make to distribute live content, the Leagues' ability to sell game tickets and secure local television and radio carriage, and the value of advertising revenue generated by broadcast, radio and new media partners. Moreover, with respect to Pay-Per-View events, it is estimated that millions of dollars in revenue are lost by copyright holders each year from the illegal streaming of their content over the Internet through such websites, which enables unauthorized viewers to watch the event live in the same quality and with the same ease as those who lawfully purchased the content through Pay-Per-View.

9.   In response to such piracy, both the Leagues and the broadcasting networks invest significant amounts to monitor such rampant acts of theft and provide notices to Internet service providers and website operators to take down illegally posted content. These "take down notices" are often ineffective, yet the costs of these efforts are passed on to sports fans and consumers when they purchase tickets or subscribe to sports networks.

10.   The problem of piracy of live sports broadcasting over the Internet is particularly pernicious in light of the fact that the value of the copyright holder's content is extremely

perishable.  There is significant value to consumers in being able to access that content while the event is still in progress. Unlike other video content offered online, including television programs and motion pictures, which often remain popular well after their debut, sports fans' interest in viewing live sporting events is greatest while the event is happening.  In addition, some sporting events – such as wrestling and boxing - involve bouts that may end within a matter of a few minutes.  Thus, even if a website is notified by a copyright holder of the infringement and takes the infringing content down within 15 minutes, the damage is already done because the pirated telecast has already been seen and all of the value of the live content has been extracted.

11.  Generally speaking, the vast majority of the websites that are involved in the illegal distribution of copyright-protected content over the Internet may be divided into two categories:"cyberlocker" websites and "linking" websites.

12.  "Cyberlocker" websites allow users to upload infringing content and often feature high-capacity data connections that allow users conveniently to download or stream that content relatively quickly.  Cyberlocker websites also may allow users to search for and download specific content directly without first going through a linking site.  Finally, a cyberlocker may use different servers to host its webpage,

receive uploads, and handle downloading or streaming content.
Each computer server connected to the Internet is identified by
one or more internet protocol ("IP") addresses, which are unique
machine-readable numeric addresses that computers use to identify
each other on the Internet.

13. "Linking" websites generally collect and catalog
links[1] to files on third-party websites that contain illegal
copies of copyrighted content, including sporting events and Pay-
Per-View events.  Linking websites organize these links by, for
example, sports type or sporting event, to make them easily
accessible.  Users simply click on a link to begin the process of
downloading or streaming to their own computer an illegal
broadcast of a sporting event or Pay-Per-View event from the
third-party website that is hosting the stream.  Linking websites
are popular because they allow users to quickly browse content
and locate illegal streams that would otherwise be more difficult
to find through manual searches of the Internet.  Moreover,
linking websites also often allow users to post additional links
to infringing content.

---

[1]    For purposes of this amended complaint, a "link" is
code that specifies a particular webpage or file on the Internet.
If clicked on by a user, a link can, for example, bring up the
relevant web page in an Internet browser or run a program.  For
example, "http://movies.nytimes.com/2010/06/18/movies/18toy.html?
scp=1&sq=toy%20story%203&st=cse" is a link to a webpage
containing the New York Times' review of the movie "Toy Story 3."
A "link" may also be referred to as a "Uniform Resource Locator"
or "URL."

14.   A domain name is a simple, easy-to-remember way for humans to identify computers on the Internet.  The Domain Name System ("DNS") is, among other things, a hierarchical convention for domain names.  Domain names are composed of one or more parts, or "labels," that are delimited by periods, such as "www.example.com."  The hierarchy of domains descends from right to left.  The right-most label conveys the "top-level" domain. DNS servers are computers connected to the Internet that convert domain names that are easy for humans to remember into IP addresses, which are unique machine-readable numeric addresses that computers use to identify each other on the Internet.  An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178).  Every computer connection to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination. DNS servers can be said to "resolve" or "translate" domain names into IP addresses.

15.   For each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address.  The registry for the ".com" top-level domain is VeriSign, Inc., located in Mountain View, California.  The registry for the ".org" top-level

domain is The Public Interest Registry, located in Reston,
Virginia.

16.   If an individual or business wants to purchase a
particular domain name, that individual or business does so
through a company called a "registrar."  The registrar, in turn,
communicates the purchase to the relevant "registry."  The
individual or business who purchases, or registers, a domain name
is called a "registrant."

### The Defendant Domain Names

17.   In connection with law enforcement's
investigation, and based on a review of the various webpages that
were accessible via the Defendant Domain Names prior to February
1, 2011, ICE agents learned the following, among other things:

a.   The Defendant Domain Names are both
registered with GoDaddy.com, Inc., a registrar located in
Scottsdale, Arizona.  The registry for the "Rojadirecta.com"
domain name is VeriSign, Inc., located in Mountain View,
California.  The registry for the "Rojadirecta.org" domain name
is The Public Interest Registry, located in Reston, Virginia.

b.   Prior to the Government's seizure, the
Defendant Domain Names resolved to a "linking" website commonly
known as "Rojadirecta" (hereinafter, the "Rojadirecta Website").
During the course of the investigation referenced above, ICE
agents accessed and monitored the Rojadirecta Website via the

Defendant Domain Names using computers located in the borough of Manhattan in New York, New York, as well as in Westchester County, New York.  Generally speaking, agents used the Defendant Domain Names to gain access to the Rojadirecta Website and to then view portions of unauthorized broadcasts of copyrighted sporting events and/or Pay-Per-View events.

c.    When an Internet user typed either of the Defendant Domain Names into that user's web browser, the user was directed to a main homepage for the Rojadirecta Website that was the same for both of the Defendant Domain Names and that carried the same IP address.  The only visible difference in the main homepage of the Rojadirecta Website when accessed by either of the Defendant Domain Names was that the URL would display either "Rojadirecta.org" or "Rojadirecta.com" in the address bar of the user's web browser, depending solely on which name the user had typed to access the Rojadirecta Website on the Internet.

d.    As a "linking" website, the Rojadirecta Website displayed numerous links to daily live sporting events and Pay-Per-View events, as well as downloadable broadcasts of sporting events or Pay-Per-View events that had been previously aired.  At all relevant times, the links displayed on the main homepage of the Rojadirecta Website were purposefully aggregated and organized by the owner(s) and/or operator(s) of the Rojadirecta Website.  Moreover, more than half of the material

9

available on the Rojadirecta Website at any given time during law
enforcement's investigation appeared to be dedicated to making
infringing content available to users of the Rojadirecta Website.

e.   At all relevant times, the homepage of the
Rojadirecta Website displayed three general categories of
aggregated and organized links to content available for viewing:
(1) "Today On Internet TV"; (2) "Download Last Full Matches"; and
(3) "Last Video Highlights."  Links for daily live sporting
events were displayed under the "Today On Internet TV" category
header.  (A copy of the Rojadirecta Website's homepage as it
appeared on or about January 31, 2011 is attached hereto as
Exhibit A).

f.   The links displayed under the "Today on
Internet TV" category header for various live sporting events and
Pay-Per-View events changed on a daily basis.  More specifically,
the links for sporting events were added as the day progressed
and an event's starting time drew closer.  The sporting events
and their starting times corresponded to individual leagues'
official events and starting times.

g.   When a user selected a link for a particular
sporting event broadcast under the "Today on Internet TV"
category header, the type of link, the name of the broadcasting
station (e.g., ESPN), the language option, and the type of
Internet media player were subsequently displayed.  Once a user

selected a specific link option, a new window appeared, which displayed the selected program and bore a URL containing the words "rojadirecta." Because the content ran on a live stream from another website, the selected broadcast did not necessarily start from its beginning; instead, the broadcast ran from whatever particular point it was presently at in the stream. Moreover, these broadcasts were shown in real time and appeared to be the same broadcasts as the authorized broadcasts of those particular events. However, the broadcasts made available via the Defendant Domain Names at the Rojadirecta Website were not authorized by the relevant copyright holders. In addition, advertisements were periodically displayed at the bottom of the video during the live stream in the web browser window that bore a URL containing the word "rojadirecta." These advertisements were separate and distinct from any commercials that may have been aired by the broadcasting station during the stream of the sporting event telecast. For example, on or about January 12, 2011, at approximately 8:41 p.m., when agents participating in the investigation selected the link for "7:30 p.m. Hockey (NHL): Pittsburgh - Montreal," agents were given the option to choose a link from several different link options for that individual sporting event. Once the agents selected a specific link option, a new window bearing a URL containing the word "rojadirecta" opened and a live NHL broadcast of the Pittsburgh Penguins vs.

Montreal Canadians hockey game began.  The broadcast was shown in real time and was the same broadcast as the authorized broadcast of that event.  Agents learned from their conversations with representatives of the NHL, however, that as of January 12, 2011, the NHL had not authorized third party distribution over the Internet of any of its broadcasts on the Rojadirecta Website.

    h.   According to Alexa.com,[2] as of on or about January 27, 2011, the Rojadirecta Website, as accessed via the Rojadirecta.org domain name, was the 2,380th most popular website in the world and the 119th most popular website in Spain. According to Compete.com,[3] the number of monthly unique visitors to the Rojadirecta Website via the Rojadirecta.org domain name had increased from 44,623 in or about February 2010 to 96,986 in or about December 2010.

    i.   According to Alexa.com, as of on or about January 27, 2011, the Rojadirecta Website, as accessed via the Rojadirecta.com domain name, was the 2,326th most popular website

---

[2]   Alexa.com is a "web traffic metric service," meaning that it performs a function similar to the traditional Nielsen television ratings service.  Among other things, Alexa.com measures the amount of visitors to a particular website relative to other websites on the Internet, provides an overall ranking of the website's popularity, and collects other information relating to the website, including the number of other websites that link to it.

[3]   Compete.com is a web page analytics service that tracks consumer behavior on the Internet, including the number of unique visitors to a particular website from month to month.

in the world and the 109th most popular website in Spain.
According to Compete.com, the number of monthly unique visitors
to the Rojadirecta Website via the Rojadirecta.com domain name
had increased from 67,476 in or about February 2010 to 99,316 in
or about November 2010.

       j.    A review of public records has revealed that
prior to February 1, 2011, the Defendant Domain Names were hosted
on a computer assigned the IP address of 67.212.67.250, which was
hosted at an Internet Service Provider in Canada.

       18.    ICE agents accessed the Rojadirecta Website via
the Rojadirecta.org domain name and thereafter streamed illegal
telecasts of sporting events and/or Pay-Per-View events.  On or
about the dates listed in the chart below, agents clicked on
links for the below-listed events that were available on the
Rojadirecta Website, as accessed via the Rojadirecta.org domain
name, and made certain captures – that is, streamed portions of
the selected events in a manner that indicated that the entire
event had been made available to users (the "Captures").
Specifically, agents viewed portions of the stream at various
intervals during the event, rather than the entirety of the
stream.

| Date | League | Event Viewed | Duration of Captures |
|------|--------|--------------|----------------------|
| December 19, 2010 | NFL | Jets vs. Steelers | 0 hr 10 min 25 sec<br>0 hr 08 min 21 sec<br>0 hr 08 min 07 sec<br>0 hr 09 min 58 sec |

| Date | League | Event Viewed | Duration of Captures |
|------|--------|--------------|----------------------|
| December 19, 2010 | WWE | Pay-Per-View TLC | 0 hr 06 min 35 sec<br>0 hr 05 min 57 sec |
| December 20, 2010 | NFL | Bears vs. Vikings | 0 hr 06 min 34 sec<br>0 hr 09 min 47 sec<br>0 hr 04 min 36 sec<br>0 hr 08 min 29 sec |
| December 28, 2010 | NBA | Knicks vs. Heat | 0 hr 07 min 45 sec<br>0 hr 09 min 46 sec<br>0 hr 06 min 13 sec |
| December 28, 2010 | NFL | Eagles vs. Vikings | 0 hr 10 min 09 sec<br>0 hr 12 min 56 sec<br>0 hr 13 min 08 sec |
| December 29, 2010 | NHL | Islanders vs. Penguins | 0 hr 07 min 10 sec<br>0 hr 06 min 16 sec<br>0 hr 07 min 31 sec |
| January 3, 2011 | NHL | Bruins vs. Maple Leafs | 0 hr 10 min 19 sec<br>0 hr 07 min 09 sec<br>0 hr 06 min 20 sec |
| January 3, 2011 | WWE | Monday Night Raw | 0 hr 10 min 17 sec<br>0 hr 06 min 52 sec |
| January 4, 2011 | NHL | Lightning vs. Capitals | 0 hr 06 min 48 sec<br>0 hr 06 min 18 sec<br>0 hr 07 min 16 sec |
| January 4, 2011 | NBA | Spurs vs. Knicks | 0 hr 06 min 45 sec<br>0 hr 06 min 34 sec<br>0 hr 07 min 13 sec<br>0 hr 07 min 53 sec |
| January 5, 2011 | NBA | Bucks vs. Magic | 0 hr 06 min 48 sec<br>0 hr 07 min 48 sec<br>0 hr 06 min 11 sec<br>0 hr 08 min 06 sec |

19.  Based on their various conversations with representatives of the Leagues, agents learned the following, among other things:

a.  As of January 25, 2011, all of the sporting event broadcasts referenced in paragraph 18 above were copyrighted, and none of the relevant copyright holders authorized the third party distribution over the Internet of

14

those sporting event telecasts by the Rojadirecta Website, as accessed via the Rojadirecta.org domain name.

b. The Leagues which hold the copyrights to the broadcasts of their respective sporting events have repeatedly provided, to the owner(s) and/or operator(s) of the Rojadirecta Website, written notices unequivocally asserting that the Rojadirecta Website was engaged in copyright infringing activity and requesting that the Rojadirecta Website cease all unauthorized use of copyrighted content. As but one example, the NBA repeatedly sent communications to publicly available email addresses associated with the Rojadirecta.org domain name, among other methods, unequivocally asserting that the Rojadirecta Website was engaged in copyright infringing activity, requesting that the Rojadirecta Website cease all unauthorized use of copyrighted content, and warning that the unauthorized use of NBA content could subject the Rojadirecta Website to liability for copyright infringement. The NBA sent such communications to email addresses associated with the Rojadirecta.org domain name at least as early as on or about February 26, 2010 and the NBA subsequently sent such communications -- unequivocally asserting that the Rojadirecta Website was engaged in copyright infringing activity, requesting that the Rojadirecta Website cease all unauthorized use of copyrighted content, and warning that the unauthorized use of NBA content could subject the Rojadirecta

15

Website to liability for copyright infringement -- on or about

November 14, 2010; December 10, 2010; December 12, 2010; December

19, 2010; December 23, 2010; and December 31, 2010, among other

dates.  These communications provided clear notice and warning to

the owner(s) and/or operator(s) of the Rojadirecta Website that

the website was engaged in copyright infringing activity.

Notwithstanding these repeated notices and warnings, the

Rojadirecta Website willfully continued to operate and make

available copyright infringing content, as described in paragraph

17 above.

    20.  ICE agents also accessed the Rojadirecta Website

via the Rojadirecta.com domain name and thereafter streamed

illegal telecasts of sporting events and/or Pay-Per-View events.

On or about the dates listed in the chart below, agents clicked

on links for the below-listed events that were available on the

Rojadirecta Website, as accessed via the Rojadirecta.com domain

name, and again made certain Captures.

| Date | League | Event Viewed | Duration of Captures |
|---|---|---|---|
| December 12, 2010 | NFL | Bengals vs. Steelers | 1 hr 32 min 54 sec<br>1 hr 04 min 07 sec |
| December 12, 2010 | NFL | Dolphins vs. Jets | 0 hr 08 min 43 sec |
| December 13, 2010 | NFL | Giants vs. Vikings | 0 hr 17 min 06 sec |
| December 14, 2010 | NBA | Timberwolves vs. Warriors | 0 hr 08 min 33 sec<br>0 hr 10 min 44 sec<br>0 hr 12 min 34 sec<br>0 hr 13 min 10 sec<br>0 hr 12 min 30 sec<br>0 hr 09 min 08 sec |

| Date | League | Event Viewed | Duration of Captures |
|------|--------|--------------|---------------------|
| December 14, 2010 | NHL | Penguins vs. Flyers | 0 hr 00 min 59 sec<br>0 hr 09 min 24 sec<br>0 hr 04 min 18 sec<br>0 hr 09 min 10 sec<br>0 hr 08 min 34 sec<br>0 hr 01 min 45 sec |
| December 15, 2010 | NBA | Celtics vs. Knicks | 0 hr 07 min 32 sec<br>0 hr 07 min 41 sec<br>0 hr 05 min 38 sec<br>0 hr 09 min 19 sec |
| December 15, 2010 | NHL | Rangers vs. Penguins | 0 hr 07 min 27 sec<br>0 hr 07 min 13 sec<br>0 hr 08 min 21 sec |
| December 16, 2010 | NBA | Wizards vs. Nets | 0 hr 05 min 25 sec<br>0 hr 06 min 27 sec<br>0 hr 05 min 10 sec |
| December 16, 2010 | NFL | 49ers vs. Chargers | 0 hr 04 min 06 sec<br>0 hr 03 min 57 sec<br>0 hr 06 min 09 sec<br>0 hr 04 min 47 sec |
| December 16, 2010 | NHL | Islanders vs. Ducks | 0 hr 01 min 49 sec<br>0 hr 04 min 15 sec<br>0 hr 05 min 35 sec |
| December 19, 2010 | WWE | Pay-Per-View TLC | 0 hr 06 min 41 sec<br>0 hr 06 min 49 sec<br>0 hr 06 min 42 sec<br>0 hr 02 min 51 sec |
| January 1, 2011 | UFC | Pay-Per-View 125 | 0 hr 04 min 43 sec<br>0 hr 06 min 17 sec<br>0 hr 06 min 36 sec<br>0 hr 05 min 25 sec |
| January 3, 2011 | NHL | Bruins vs. Maple Leafs | 0 hr 06 min 31 sec<br>0 hr 06 min 18 sec<br>0 hr 07 min 06 sec |
| January 3, 2011 | WWE | Monday Night Raw | 0 hr 10 min 40 sec<br>0 hr 08 min 15 sec |
| January 4, 2011 | NHL | Lightning vs. Capitals | 0 hr 06 min 43 sec<br>0 hr 06 min 00 sec<br>0 hr 06 min 07 sec |
| January 5, 2011 | NBA | Bucks vs. Magic | 0 hr 09 min 09 sec<br>0 hr 05 min 06 sec<br>0 hr 06 min 16 sec<br>0 hr 06 min 11 sec |

21.   Based on their various conversations with representatives of the Leagues, agents learned the following, among other things:

a.   As of January 25, 2011, all of the sporting event broadcasts referenced in paragraph 20 above were copyrighted, and none of the relevant copyright holders authorized the third party distribution over the Internet of those sporting event telecasts by the Rojadirecta Website, as accessed via the Rojadirecta.com domain name.

b.   The Leagues which hold the copyrights to the broadcasts of their respective sporting events have repeatedly provided, to the owner(s) and/or operator(s) of the Rojadirecta Website, written notices unequivocally asserting that the Rojadirecta Website was engaged in copyright infringing activity and requesting that the Rojadirecta Website cease all unauthorized use of copyrighted content.  As but one example, the NBA repeatedly sent communications to publicly available email addresses associated with the Rojadirecta.com domain name, among other methods, unequivocally asserting that the Rojadirecta Website was engaged in copyright infringing activity, requesting that the Rojadirecta Website cease all unauthorized use of copyrighted content, and warning that the unauthorized use of NBA content could subject the Rojadirecta Website to liability for copyright infringement.  The NBA sent such communications to

email addresses associated with the Rojadirecta.com domain name
at least as early as on or about July 10, 2007 and the NBA
subsequently sent such communications -- unequivocally asserting
that the Rojadirecta Website was engaged in copyright infringing
activity, requesting that the Rojadirecta Website cease all
unauthorized use of copyrighted content, and warning that the
unauthorized use of NBA content could subject the Rojadirecta
Website to liability for copyright infringement -- on or about
October 26, 2010; December 9, 2010; December 11, 2010; December
12, 2010; December 13, 2010; December 15, 2010; December 18,
2010; December 20, 2010; January 2, 2011; January 3, 2011; and
January 5, 2011, among other dates.  These communications
provided clear notice and warning to the owner(s) and/or
operator(s) of the Rojadirecta Website that the website was
engaged in copyright infringing activity.  Notwithstanding these
repeated notices and warnings, the Rojadirecta Website willfully
continued to operate and make available copyright infringing
content, as described in paragraph 17 above.

22.  Based on records obtained from Google, Inc., Igor
Seoane Miñán, the CEO of Puerto 80 Projects, S.L.U., the owner of
the Defendant Domain Names, has received more than $25,000 since
at least in or about January 2006 from Google AdSense, a free
program that allows website publishers to earn revenue by
displaying advertisements that are likely to be relevant and of

interest to users of those websites, in connection with the operation of the Rojadirecta Website.

23.   In light of law enforcement's investigation, on January 31, 2011, Special Agent Daniel M. Brazier of ICE submitted an affidavit in support of an application for warrants to seize the Defendant Domain Names.  Warrants were issued that same day by the Honorable Frank Maas, United States Magistrate Judge for the Southern District of New York, who found probable cause to believe that the Defendant Domain Names were subject to forfeiture because they had been used to commit and facilitate the commission of criminal copyright infringement, and contained evidence of that crime.  The Defendant Domain Names were subsequently seized by ICE pursuant to these warrants on February 1, 2011.

24.   Since the time of the February 1, 2011 seizure of the Defendant Domain Names, ICE agents have learned that the Rojadirecta Website is presently available and fully accessible on the Internet via the following domain names, among others: "Rojadirecta.es," "Rojadirecta.me," and "Rojadirecta.in."

### III.   CLAIM FOR FORFEITURE

25.   Incorporated herein are the allegations contained in paragraphs one through twenty-four of this Amended Complaint.

26.   Pursuant to Title 18, United States Code, Section 2323(a)(1)(A) the following property is subject to forfeiture:

"[a]ny article, the making or trafficking of which, is prohibited under section 506 of title 17, or section . . . 2319 . . . of [title 18]."

27.   Furthermore, 18 U.S.C. § 2323(a)(1)(B) further subjects to forfeiture "[a]ny property used, or intended to be used, in any manner or part to commit or facilitate the commission of an offense referred to in subparagraph (A)."

28.   The Defendant Domain Names are subject to forfeiture pursuant to Title 18, United States Code, Sections 2323(a)(1)(A)-(B) because there is probable cause to believe that they constitute property used, or intended to be used, to commit or facilitate the commission of criminal infringement of a copyright in violation of 17 U.S.C. § 506 and 18 U.S.C. § 2319.

29.   By reason of the above, the Defendant Domain Names became, and are, subject to forfeiture to the United States of America, pursuant to Title 18, United States Code, Sections 2323(a)(1)(A)-(B).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Domain Names and that all persons having an interest in the Defendant Domain Names be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Domain Names to the United States of America for disposition according to law, and that this Court

grant plaintiff such further relief as this Court may deem just
and proper, together with the costs and disbursements of this
action.

Dated: New York, New York
       January 6, 2012

                         PREET BHARARA
                         United States Attorney for
                         the Southern District of New York
                         Attorney for the Plaintiff
                         United States of America

              By:    _Christopher D. Frey_____
                         CHRISTOPHER D. FREY
                         ANDREW G. GOLDSTEIN
                         Assistant United States Attorney
                         One St. Andrew's Plaza
                         New York, New York 10007
                         Telephone: (212) 637-2270/1559

                                   22

<u>VERIFICATION</u>

STATE OF NEW YORK                         )
COUNTY OF NEW YORK                        :
SOUTHERN DISTRICT OF NEW YORK             )

     DANIEL M. BRAZIER, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security, Bureau of Immigration and Customs Enforcement, and as such has responsibility for the within action; that he has read the foregoing amended complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information and belief.

     The sources of deponent's information and the ground of his belief are conversations with other law enforcement officers and others, official records and files of the Bureau of Immigration and Customs Enforcement, and the United States Government, and information obtained directly by deponent during an investigation of alleged violations of Title 18, United States Code.

                                                _____
                                    DANIEL M. BRAZIER
                                    Special Agent
                                    U.S. Dept. of Homeland Security
                                    Bureau of Immigration
                                    and Customs Enforcement

Sworn to before me this
6th day of January, 2012

_____
NOTARY PUBLIC

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires _May 8, 2014_