1c67rojm

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                                11 Civ. 4139

5   ROJADIRECTA.ORG
    and ROJADIRECTA.COM,
6
                 Defendants.
7
    ------------------------------x
8
                                         December 6, 2011
9                                        3:30 p.m.

10

11  Before:

12                    HON. PAUL A. CROTTY
                                         District Judge
13

14                       APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  CHRISTOPHER FREY
17       DAVID MILLER
         Assistant United States Attorneys
18
    DURIE TANGRI LLP
19       Attorney for Defendants
    BY:  RAGESH TANGRI
20
    SPEARS & IMES LLP
21       Attorney for Defendants
    BY:  DAVID SPEARS
22

23

24

25

1c67rojm

1          (Case called)

2          (In open court)

3          MR. FREY:  Good afternoon, your Honor.  Christopher

4   Frey and David Miller for the government.

5          MR. MILLER:  Good afternoon, your Honor.

6          THE COURT:  Mr. Frey, Mr. Miller, how are you?

7          What happened to your colleague?

8          MR. TANGRI:  He just stepped out for a moment.  I

9   think he is coming back.  We can proceed.  I don't want to take

10  up the court's time.  Ragash Tangri for the Puerto 80.

11         THE COURT:  OK, Mr. Tangri.  And who is with you?

12         MR. TANGRI:  David Spears.  Mr. Spears and I.

13         THE COURT:  We will just wait a minute.  Here is

14  Mr. Spears now.

15         Mr. Tangri, are you going to start off?

16         MR. TANGRI:  Yes, your Honor.

17         THE COURT:  OK.

18         MR. TANGRI:  Good afternoon, your Honor.  As we

19  explained in the briefing, we believe that the government has

20  over the course of this matter fundamentally shifted its

21  position.  The theory of the case that it is advancing now is

22  not one that it pled in its complaint.  In light of that, I'm

23  going to say briefly what I believe the government is no longer

24  alleging and then talk about what I think its new theory of the

25  case is, and address why that theory, even if it were pled,

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1c67rojm

```
1    would not state a claim.

2             I think everyone agrees that the government can only

3    plead forfeiture if the domain names were used to commit or to

4    facilitate the commission of a crime, and I think that everyone

5    agrees here that the crime that is alleged to have been

6    committed is criminal copyright infringement.

7             The question and where the shift has occurred is who

8    it is that the government is alleging has committed the

9    criminal copyright infringement.  I think the complaint as

10   drafted, especially in paragraph 24, alleges that

11   Rojadirecta -- or Puerto 80 through the Rojadirecta site --

12   committed criminal copyright infringement, and as we recited in

13   our reply --

14           THE COURT:  Let me get to paragraph 24.  That they

15   constituted property used or intended to be used to willfully

16   infringe a copyright.  All right.

17           MR. TANGRI:  That's the operative allegation in the

18   complaint as we read it.  And as we cited in our reply brief at

19   pages 2 through 3 there are a number of pleadings that the

20   government has filed in this case taking the position that it

21   was Puerto 80 that was responsible for criminal copyright

22   infringement.  That I think is what has now changed.

23           As I read the government's opposition brief, they are

24   no longer saying that Puerto 80 committed criminal copyright

25   infringement; they are now saying that some other website or
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1c67rojm

1   websites, to which Puerto 80's website linked, commit criminal

2   copyright infringement.

3           THE COURT:  How does this work, Mr. Tangri?  I go on

4   Rojadirecta.com or .org and a get a menu of games.  Is that

5   correct so far?

6           MR. TANGRI:  That is one of the things you can get

7   there, your Honor, but, yes, that is correct.

8           THE COURT:  I mean that's the one that brings us here

9   today, right?

10          MR. TANGRI:  That's the one that brings us here today.

11          THE COURT:  Then I can hit on a game?  Or link on a

12  game?

13          MR. TANGRI:  You click on what is a link on the

14  Rojadirecta site.

15          THE COURT:  And what happens then?

16          MR. TANGRI:  A new window comes up in your browser,

17  and you are taken to another website from which a telecast of

18  that game is being streamed.  There is no allegation in the

19  complaint -- and I believe it's conceded by the government and

20  by the government agent's affidavit that supported the

21  forfeiture warrant -- there is no allegation that any of this

22  allegedly infringing content resides on Rojadirecta's website,

23  and therefore there is no allegation that it is streamed from

24  Rojadirecta's website.

25          THE COURT:  You say allegedly copyrighted material.

1c67rojm

1   There is no doubt that the material that's being streamed is

2   copyrighted.

3           MR. TANGRI:  Your Honor, I think at this stage of the

4   proceeding the allegation in the complaint -- which we have to

5   take at face value for 12(b)(6) purposes -- is that the

6   material is copyrighted.

7           THE COURT:  Right.

8           MR. TANGRI:  Whether or not -- and this is I think is

9   an important point that I was planning to turn to in a moment,

10  but let me --

11          THE COURT:  I don't want to take you out of the order

12  of your argument.

13          MR. TANGRI:  No, that's fine.  There is a difference

14  between displaying copyrighted material and making an

15  unauthorized display of copyrighted material.  In other words

16  --

17          THE COURT:  Is this your display and dissemination

18  distinction?

19          MR. TANGRI:  No, this is a different distinction, your

20  Honor.  This is a distinction that relates to the willfulness

21  argument.  So, perhaps I will save it for there, but I just

22  wanted to footnote the point.

23          It's not necessarily clear that all of this material

24  that's being streamed from these other websites is on those

25  websites without people's authorization.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1c67rojm

1          There is certainly allegations in the complaint that

2      some of the material that was viewed by the agents was posted

3      on some other website without authorization.  That's alleged.

4      But it is not the case that all sports telecasts that can be

5      linked to on the Internet are up there without the

6      authorization of the copywriter.

7          THE COURT:  Now, when I hit on the link

8      Rojadirecta.com or .org and I go to the streaming sports event,

9      am I correct that there is something that indicates that it's

10     Rojadirecta in the browser, there is a URL that says

11     Rojadirecta on it?

12         MR. TANGRI:  There is a you URL that begins with

13     Rojadirecta, and then there is a slash, and then there is the

14     name of the other website.  This is a common convention or form

15     on the Internet in which this is how one site can deliver

16     content from another site to which it is linking.

17         If you took that URL and you highlighted the

18     Rojadirecta part of it and you deleted it, so that instead of

19     saying www.rojadirecta.com/sportsisus -- I am making that up --

20     .com/, and you deleted the Rojadirecta part so it just said

21     www.sportsisus, the exact same thing would be playing.

22         THE COURT:  But who puts the Rojadirecta on the URL?

23         MR. TANGRI:  The URL is put there by Rojadirecta, but

24     it does not have the content that is linked there on its site.

25         THE COURT:  Does Rojadirecta run ads on the bottom,

7

1c67rojm

1      streaming a banner of ads, I guess you call them?

2              MR. TANGRI:  No, your Honor.  Those ads are run by the

3      website that is streaming that content.  Those ads are being

4      run by the website that is streaming that content.  In fact, if

5      you were to perform the experiment I just described, you would

6      see that even after you removed the Rojadirecta from the URL,

7      and it's just www.sportsisus, the same banner ads remain, which

8      shows you that they're coming from that originating website to

9      which Rojadirecta is linking but which it does not control.

10             THE COURT:  OK, go ahead.  I have a few more

11     questions, but I won't interrupt you.  Why don't you go ahead

12     and finish.

13             MR. TANGRI:  OK.  So, I think because the government

14     appreciates what we have just been discussing, I believe that's

15     why they -- and in light of the briefing that we put in in our

16     opening brief -- have moved from arguing that Rojadirecta

17     itself or Puerto 80 itself is committing criminal copyright

18     infringement to allege these other websites are doing it, and

19     what Rojadirecta is doing they contend is facilitating that.

20     So, they point to the facilitation prong of the forfeiture

21     statute as now being the basis for their complaint.  As I said,

22     that's not what is literally pled in the complaint, but we

23     should address it because it's where we are today, and it's

24     what they have argued in their opposition brief.

25             And the problem with that, and the reason that those

1c67rojm

1    allegations would not state a claim, is twofold:  First, the

2    complaint doesn't adequately allege, nor does the opposition

3    brief adequately state a theory under which even those other

4    websites are engaged in criminal copyright infringement,

5    neither as a matter of the acts that they are performing, nor

6    as a matter of the intent with which they are performing it.

7    Second, the facilitation prong of the statute can't be read as

8    broadly as the government would seek to read it here,

9    particularly when what we are dealing with is a website that is

10   engaged in expressive speech.  And you are dealing with First

11   Amendment concerns.  The First Amendment constrains, we submit,

12   the construction to facilitate on these facts.

13        THE COURT:  I just give you a red alert here.  You

14   raised your First Amendment arguments in your reply brief, not

15   in your original brief.

16        MR. TANGRI:  I --

17        THE COURT:  So, I'm not going to entertain First

18   Amendment arguments here.  You know, you knew about the First

19   Amendment issue; it's in the papers that you filed back in the

20   summer when you asked for release of the seized properties, and

21   I invited at that time you to talk about First Amendment in the

22   motion to dismiss, and you didn't say anything about the First

23   Amendment arguments, which might very well have traction until

24   the reply brief.  So, the government hasn't had an opportunity

25   to respond, so on this motion right here, Mr. Tangri, I'm not

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

1c67rojm

1    going to consider the First Amendment arguments.  I just want

2    you to know that.

3          MR. TANGRI:  I hear your Honor.  Let me just say on

4    that point that the only reason -- just to be as clear as we

5    can about it -- the only purpose for which we are addressing

6    the First Amendment, and the only purpose for which we

7    addressed it in the reply brief, goes to the construction of

8    the term facilitation.  And the fact that what Roja was being

9    accused of in this complaint was facilitation and not criminal

10   copyright infringement in its own right was something that came

11   up in the government's opposition brief.  And as I argued, it's

12   not pled in there.

13          So, we did make a separate First Amendment argument

14   before.  We didn't read it as applicable to the motion to

15   dismiss as charged until we got the opposition brief and they

16   shifted to facilitation.  And all we are arguing it for is the

17   line of cases that says one should construe this statute to

18   avoid constitutional issues.  And this is a different argument

19   than the First Amendment argument we ran before.  So, just by

20   way of explanation.

21          THE COURT:  I appreciate the clarification.

22          MR. TANGRI:  Returning to copyright infringement and

23   the reason why neither the complaint nor the opposition brief

24   articulates a theory under which even these unknown, unnamed,

25   unidentified third-party websites can be alleged to be

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1c67rojm

1    committing criminal copyright infringement.

2            The Copyright Act gives copyright holders certain

3    defined rights.  It proscribes certain defined conduct by

4    others.

5            The right that the government appears to be alleging

6    or arguing was violated here was the distribution right.  They

7    are saying that the third-party websites distributed copies of

8    the alleged infringing sports telecasts.

9            The distribution right to be violated requires that a

10   copy be disseminated.  A broadcast is not a copy.  A copy has

11   to be fixed in a tangible medium for longer than a transitory

12   duration, and under cases such as the Arista v. MP3 Board case

13   decided in this district, under the Cartoon Network v. CSC in

14   the Second Circuit, commonly known as the Cablevision case, and

15   under Agee v. Paramount, also in this Circuit, streaming or

16   broadcasting does not amount to distribution; it does not

17   violate the distribution right because no --

18           THE COURT:  I am really not very sophisticated in

19   these matters, Mr. Tangri, but when I watch the Yankees games

20   on TV periodically you get this little announcement from the

21   announcer who says, you know, broadcast rights are restricted

22   and, you know, they are owned by the Yankees, and you can't

23   rebroadcast them without specific authorization.  So, I have

24   always assumed that if you used the Yankee signal on the YES

25   network out their authorization you have somehow violated the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1c67rojm

1    law.  Are you telling me that's not so?

2              MR. TANGRI:  I am not necessarily telling you that's

3    not so, your Honor.  It depends on who does it and what they

4    do.  And what the government's opposition brief and complaint

5    alleges is that the distribution right is violated.  So, if you

6    make a videotape or a DVD of the Yankees game, and you make a

7    lot of copies of it, and you sell it out of the back of your

8    car or some other way, selling copies of the thing, you may

9    well be violating the distribution right because you are

10   distributing a copy.  There is a tangible thing, the

11   copyrighted work is fixed in that tangible medium, and it's

12   being distributed to somebody.

13             THE COURT:  I have to make a copy?

14             MR. TANGRI:  Yes.  The distribution rights --

15             THE COURT:  What if I just gather the signal and

16   broadcast it further?

17             MR. TANGRI:  That does not violate the distribution

18   right, your Honor.  That is precisely the holding of the case.

19             THE COURT:  That's the Cablevision case?

20             MR. TANGRI:  That's the Cablevision case, your Honor.

21   That's what was being done there, and they said not a

22   distribution.  It may be some other things but not a

23   distribution.  And distribution is the offense that the

24   government has elected to proceed under.  And as to these

25   unknown third-party websites the allegations are not sufficient

1c67rojm

1    to show distribution because there's nothing about a copy.

2              The complaint also importantly does not allege that

3    any of those unknown, unidentified websites is within the

4    United States.

5              And copyright law -- again we put the cases in our

6    opening papers -- is territorially limited in its application.

7    The act of infringement has to take place within the United

8    States.  The government responded that the domain names were

9    registered here.  But the domain names are not the act of

10   infringement -- the alleged act of criminal copyright

11   infringement.  Again, this is the streaming of these

12   broadcasts, and that's happening from some unidentified place

13   which I think everyone assumes is overseas.

14             THE COURT:  Well, again to go back to what you filed

15   this summer.  You said you wanted the domain names back because

16   you were being injured here in the United States.  Isn't that a

17   concession that the copyright infringement was having an impact

18   here in the United States?

19             MR. TANGRI:  The fact of whether -- I mean -- no, it's

20   not, your Honor, because what has to be shown is that the acts

21   constituting infringement are taking place in the United

22   States.  The acts constituting infringement here are alleged to

23   be taken by these third-party sites, streaming sites.  There is

24   no allegation that they are in the United States.

25             THE COURT:  Mr. Miller?

1c67rojm

 1            MR. MILLER:  I apologize, your Honor.

 2            THE COURT:  You are going to have to turn off your

 3    phone.  You are not supposed to have it on in the courtroom.

 4            MR. MILLER:  I didn't realize it was on, your Honor;

 5    in fact I always turn it off, so I'm turning it off right now.

 6            THE COURT:  You didn't know it was turned on?  It's

 7    on.

 8            MR. MILLER:  I apologize.

 9            THE COURT:  All right.  Go ahead, Mr. Tangri.

10            MR. TANGRI:  I was trying to just keep going and hope

11    nobody would notice.  We have all been there or worry about

12    being there, so...

13            The Perfect Ten case, your Honor, that we cited in our

14    opening brief holds the geographic point that I am addressing

15    now, that the locus of the infringing activity is what you look

16    to for whether the territorial application of the Copyright Act

17    has been exceeded.  It is not merely an effects test as one

18    thinks about for personal jurisdiction purposes in some cases.

19    You have to look at where the copyright infringement took

20    place, and here there is no indication it happened in the U.S.

21            The next point as to why the government hasn't alleged

22    in the complaint or proffered arguments in opposition to

23    establish criminal copyright infringement by these third-party

24    websites goes to willfulness.

25            criminal copyright infringement has to be willful.

1c67rojm

1    It's willful in the strong sense of the word.  It's not general

2    scienter; it's specific intent.  It's like cheat and screws in

3    the criminal context.  And the government I don't think

4    disputes this.  Both parties acknowledge that it was once

5    otherwise in the Second Circuit in 1943, but amendments to the

6    Copyright Act since then superseded that.  More recent Second

7    Circuit cases cited by both us and the government, including

8    the Twin Peaks case from the early '90s, make clear that it's a

9    specific intent standard to establish willfulness.

10          THE COURT:  And the government also says they disagree

11   with you.  They say if we don't have willfulness, allow us to

12   amend the complaint.

13          MR. TANGRI:  I think, your Honor, that goes to the

14   formal locution.  And I'm trying to address here the fact that

15   a bare allegation of willfulness isn't going to cut it under

16   Iqbal and Twombly -- which everyone acknowledges applies to

17   this.  There is discussion in the papers of the pleading

18   standards for these complaints is perhaps even higher than

19   that.  A legal conclusion like that would be disregarded.  In

20   fact Iqbal was a mental intent, what was the intent of the

21   government; and the bare bones allegation was what was held to

22   be insufficient.  You had to have facts from which, if

23   believed, someone could infer intent.  And here they haven't

24   proffered any.  So, that's the key point.

25          They have talked somewhat in their papers about

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1c67rojm

```
 1    Rojadirecta's intent.  That doesn't work.  If Rojadirecta is
 2    not the actor accused of taking the acts that constitute
 3    criminal copyright infringement, you cannot graft its alleged
 4    intent to the acts of some third party, unknown, unidentified
 5    website, and cobble both actus reus and mens rea together; they
 6    need to reside in the same person.
 7              THE COURT:  What do you say about the allegation that
 8    you purposefully entered in extremely specific and illegal
 9    content and actively organized the material in a focused and
10    logical manner?
11              MR. TANGRI:  Rojadirecta -- I believe it's agreed --
12    did not aggregate illegal content.  There is no allegation that
13    any of these sports telecasts are contained on or being
14    streamed from Rojadirecta's servers.
15              There is an allegation that we organized links or that
16    the site organizes links to these other websites that we are
17    discussing.  Again that, if it's an allegation about anything,
18    it may be an allegation about our intent, Rojadirecta's intent.
19    We can talk in a moment about who else does similar things, but
20    that's not sufficient to be an allegation about the intent of
21    the actors who are now being alleged to have committed the acts
22    that the government would have form the basis of criminal
23    copyright infringement, the third-party websites.
24              THE COURT:  Well, assuming that somebody else is
25    actually doing the actual infringement, what do you say about
```

1c67rojm

1  your role in actively assembling information from all over and

2  gathering up or harvesting Internet users on their computers

3  and providing them a facility for getting to this illegal

4  material that's wrongfully distributed, copyrighted material?

5      MR. TANGRI:  Again, I've discussed the distribution

6  point, so I won't rehash that.  But what we say about that,

7  your Honor, is that that is not meaningfully different.  I mean

8  that is the backbone of the Internet.  Linking from site to

9  site is how the Internet works, and any search engine -- if you

10  were to go to any search engine, Bing, Microsoft's search

11  engine, Yahoo's search engine, anyone's search engine, and

12  enter the name of the football game or baseball game, Yankees

13  v. Devil Rays, whatever it is, and the dated, you will get a

14  list of sites.  It creates that index on the fly dynamically,

15  but it creates it nevertheless.

16      We put examples in our papers of other sites that link

17  to all sorts of content on the Internet, and any of that can be

18  alleged to be infringing.

19      THE COURT:  So, in your view, Mr. Tangri, linking is

20  never enough.

21      MR. TANGRI:  It's not just my view, your Honor, but we

22  cited in the opening papers cases from this circuit holding

23  that linking does not constitute direct infringement.

24      And the reason the direct infringement point is

25  important is that -- as everyone I think has acknowledged

1c67rojm

```
 1    here -- there is no criminal indirect infringement.  There is

 2    no criminal contributory infringement, there is no criminal

 3    vicarious infringement, there is no criminal inducing

 4    infringement.  The only form of copyright infringement that

 5    will support a criminal charge is direct infringement, and the

 6    law is very clear that linking does not constitute direct

 7    infringement.  It may in the civil context be something else,

 8    but those "something elses" are not the basis in criminal

 9    charges for copyright.

10              THE COURT:  Do you want to take two minutes and sum

11    up, and then I will give you some time for rebuttal after we

12    hear from the government.

13              MR. TANGRI:  Yes, your Honor.  I just want to say in

14    response to what it says in the Yankees telecast point that

15    your Honor raised, I think that best goes to the willfulness

16    argument, saying, well, somebody must have that telecast, they

17    must have heard that.  The law is clear -- and this is again in

18    the reply brief -- that that is not sufficient to show an act

19    of infringement and then argue that because the infringement

20    has been proven willfulness is also proven.

21              THE COURT:  Well, what if somebody went to you -- not

22    to you, Mr. Tangri -- but to your client, to Puerto 80 or

23    Rojadirecta -- and said somebody from Major League Baseball or

24    National Hockey League or the football people, and said, you

25    know, you are streaming our content and it's wrong, you are
```

1c67rojm

1    violating our copyright, we want you to stop; and you say --

2    you know, you don't do what they ask you to do, and you keep on

3    making the content available.  Does that make it willful?  I

4    mean now you know.

5              MR. TANGRI:  Well, the first thing I would say, your

6    Honor, is I think we would again say we're not streaming it.

7              THE COURT:  Yes, I understand.

8              MR. TANGRI:  Getting past that point --

9              THE COURT:  Getting past that point -- which is a big

10   hurdle to get over -- but if you are past that point now, you

11   have been told, you have been told specifically.

12             MR. TANGRI:  And the cases that the government

13   cites -- they cite two cases.  One is called Getaped, and one

14   is Castle Rock -- those cases provide some support for that

15   notion when you are dealing with a specific work.

16             So, if a copyright order goes to a website and they

17   say you have a copy of my movie, for example, once or something

18   up there, and that's an infringing copy, please take it down,

19   and the website doesn't take it down, that can be evidence

20   of -- not inclusive on -- but evidence of willfulness.

21             The cases distinguish between that circumstance and

22   the circumstance where a more general notice is provided, hey,

23   we copyright all our movies, we copyright all our sports

24   telecasts, therefore if you have any of them, it's willful.

25   That has been held to be not sufficient, and one of the reasons

1c67rojm

```
 1    it's been held to be not sufficient is Section 506(a)(2), which
 2    is the section I was referring to earlier which says simply
 3    having knowledge of infringement or proof of infringement
 4    doesn't suffice to get you willfulness.
 5            Another reason is the point that I started to make at
 6    the beginning when you raised the example of the Yankees
 7    telecast with the language that comes up in it.  There are
 8    plenty of places you can go on the Internet -- Yahoo Sports, a
 9    major American corporation that has a deal with various
10    sporting leagues to broadcast their content; ESPN and others --
11    you can find plenty of lawfully streamed sporting content on
12    the Internet, and you can link to it.  Somebody else can link
13    to it, and at that point you are not linking to an infringing
14    work, you are linking to an authorized display of copyrighted
15    work.  And the evidence and the allegations in the complaint is
16    that this cite, the Rojadirecta site, allows users to post
17    links to it.
18            The final thing I would say is that the complaint
19    itself sort of acknowledges this.  When it describes the
20    actions undertaken by the agents who performed the
21    investigation, the complaint strongly implies that the agents
22    didn't know at the time they were watching these streaming
23    broadcasts that they had linked to via Roja's site that they
24    were unauthorized.  The complaint goes on to say after they
25    watched them that they contacted the leagues and asked about
```

1c67rojm

1    the individual ones that they had seen, and they were informed

2    that those were not authorized to be on the Internet on those

3    dates and times.

4              That I think is an example of why one can't just infer

5    from the presence of content that asserts that it is subject to

6    copyright, that having it up there is willful infringement,

7    much less linking to it.

8              THE COURT:  Thank you, Mr. Tangri.

9              Mr. Fryer or Mr. Miller?

10             MR. FREY:  Yes.  Thank you, your Honor.

11             Your Honor, I want to start where Mr. Tangri started,

12    and that's with paragraph 24 of the complaint.

13             Paragraph 24 makes clear that it is in the

14    government's allegations the defendant domain names that are

15    subject to forfeiture.  And those defendant domain names refer

16    to two pieces of property:  Rojadirecta.org, Rojadirecta.com.

17    And, as a result, this is an in rem proceeding, it is a

18    proceeding against property, which obviously is a little

19    unusual and perhaps unfamiliar to most of us.  And it further

20    alleges that it is those domain names that constitute property

21    used or intended to be used to willfully infringe copyright in

22    violation under the criminal copyright statute.

23             THE COURT:  How do they do that?

24             MR. FREY:  How do they do that?

25             THE COURT:  They just provide a link, as Mr. Tangri

1c67rojm

 1    said.

 2          MR. TANGRI:  Well, the website, the Rojadirecta

 3    website, provides links.  The domain names direct you as the

 4    Internet user to that website.

 5          THE COURT:  As I understand it, I can go on

 6    Rojadirecta.org or .com and get a list of events, and that's

 7    all it is, it's a list.  Is that correct so far?  And then I

 8    have to hit one of those events that I want to see, and that

 9    creates a link that takes me to another site.  Correct?

10          MR. FREY:  Well, your Honor, the links are created

11    already on the site and, you're right, what the website does is

12    it organizes links to various sporting events, it updates those

13    links as the day progresses and as sporting events draw near in

14    time.

15          THE COURT:  So, when I go onto the Rojadirecta.org or

16    .com site, I don't see any events, I just see the list.

17          MR. FREY:  That's correct, your Honor.

18          THE COURT:  I see curling from Canada.

19          MR. FREY:  You might see curling from Canada.

20          THE COURT:  Or women's volleyball from Saudi Arabia,

21    or some kind of remote event in Abu Dhabi.

22          MR. FREY:  Yes.  And what you will also see, your

23    Honor, is American basketball games, American baseball games,

24    American football games, links to view those individual

25    sporting events.

1c67rojm

1          THE COURT:  Are we to assume -- what is the copyright

2    infringement here though?  Is it the link or what the link

3    takes you to?  And what about Mr. Tangri's point that some of

4    the sites that you are taken to are legitimate sites, in other

5    words, they have the appropriate permissions or they are within

6    some kind of fair use doctrine, or they are not distributing

7    the content under the Cablevision decision, so you are watching

8    something that's perfectly lawful?

9          MR. FREY:  Let me address a couple of those points,

10    your Honor.

11          First, based on the captures that are set forth in the

12    complaint, the actual events that the agents themselves

13    streamed using the Rojadirecta domain names, therefore going to

14    the Rojadirecta website, none of those were authorized.  Those

15    broadcasts that they were able to view using the Rojadirecta

16    website, none of those were authorized by the relevant

17    copyright holders.

18          While there may be here and there an authorized

19    broadcast, that's certainly not what the complaint alleges.

20    And there is enough in the complaint to support the fact that

21    what is being distributed, what is being set forth over the

22    Internet is actually unauthorized copyrighted material.

23          The other thing that -- and I think this is important

24    as well because the complaint alleges this --

25          THE COURT:  But the mechanism, the computer or the

1   server which is broadcasting or disseminating or distributing

2   this illegally copied material in violation of the copyright is

3   not Rojadirecta.  It's not their server, is it?

4          MR. FREY:  I don't think the complaint says that it's

5   hosted on the Rojadirecta's server, your Honor.  What it says

6   is that Rojadirecta, the domain names, are facilitating

7   criminal copyright infringement.  So, let me address two

8   related points on that.

9          The government has not shifted its position.  It has

10  consistently taken the position that Rojadirecta, its operator

11  Puerto 80, are engaged in aiding and abetting.  It's a theory

12  of criminal liability.

13         THE COURT:  So, I mean the government must show the

14  following things:  The existence of a valid copyright.  Mr.

15  Tangri doesn't really complain about that.  He says that's an

16  allegation in the complaint.  But what is the willful act of

17  infringement here?

18         MR. FREY:  It is the distribution of those -- the

19  broadcast of those sporting events.

20         Now, there is a section on the Rojadirecta web page

21  that has live sporting events, events that are being broadcast

22  in real time, but there is also a section -- as paragraph 14(a)

23  of the complaint sets forth -- a section where one can download

24  last full matches.  It is not a real time broadcast of the

25  event, it is a download or a stream of a copy, that very copy

1c67rojm

 1    that Mr. Tangri is referring to, that is being transmitted.

 2    Someone recorded that and is then retransmitting it across the

 3    Internet, and the Rojadirecta domain names are facilitating

 4    that.  They are aiding and abetting that direct copyright

 5    infringement.

 6              It's not the case, as paragraph 14 --

 7              THE COURT:  Where in your complaint do you allege

 8    aiding and abetting?  I thought you were suggesting that what

 9    Rojadirecta did itself was not contributory but was an actual

10    act of direct infringement.

11              MR. FREY:  I think, your Honor, the way that the

12    complaint is pled is that it's pled alternatively.  It's pled

13    as a direct infringement, but to the extent that that argument

14    fails, aiding and abetting liabilities or accessory liability

15    is a perfectly appropriate way and, to be quite frank, a common

16    way in which the government routinely proves criminal liability

17    and would prove criminal liability under the criminal copyright

18    statute.

19              THE COURT:  But you are not pursuing criminal

20    liability here, right?

21              MR. FREY:  At this point, no, your Honor, we are not.

22    And I think that's an important point as well, and that being

23    that the government doesn't have to prosecute or convict anyone

24    of the underlying crime in order to seek forfeiture of property

25    that's being used.

1c67rojm

1          THE COURT:  Well, if you were going to prosecute the

2    underlying crime, who would you indict?

3          MR. FREY:  We are here in the world of pure

4    speculation?  I don't know the answer to that, your Honor.  I

5    think there is an argument --

6          THE COURT:  Well, would you indict Rojadirecta.com?

7          MR. FREY:  No, I don't think it would be the website,

8    your Honor.  I think it would probably be the owner -- the

9    operator of the website that we would be seeking an indictment

10   against.

11         THE COURT:  A human being.

12         MR. FREY:  A human being, yes.  I think that's likely

13   what would happen.

14         Your Honor correctly noted that the URL, as set forth

15   in the complaint at paragraph 14(c), undermines the fact that

16   you are taken to an entirely different website.

17         Some of what Puerto 80 is asserting to me seem like

18   questions of fact, questions that would need to be resolved in

19   a period of discovery.  The government has set forth

20   allegations, a fair inference from which could be drawn that

21   it's Puerto 80 or the Rojadirecta website itself that's hosting

22   some of this material, perhaps even some of the download of the

23   last full matches, based on the fact that the URL begins with

24   Rojadirecta.

25         The way that the complaint is pled also in paragraph

1c67rojm

1    14 indicates the agent's understanding or at least what was

2    apparent to the agents who did the downloads, that it was

3    Rojadirecta that was appending advertisements to these

4    broadcasts and not that were being appended by some other

5    entity at another website.

6         THE COURT:  Let me ask you a question.  Mr. Tangri

7    said that Rojadirecta was not responsible for the banner on the

8    offending material.  And I was assuming reading your

9    complaint -- you're right, Mr. Frey, this is a factual matter.

10   But where is the financial gain to Rojadirecta?  Does there

11   have to be a financial gain here as well?

12        MR. FREY:  Your Honor, I think the complaint does

13   contain allegations in a more general sense that revenue is

14   generated from advertisement.  It does not specifically allege

15   that Rojadirecta in placing those advertisements generated

16   revenue.  That is perhaps admittedly a deficiency in the way

17   that the complaint is pled, and if leave were granted that

18   could be corrected.

19        This are certainly though allegations in the beginning

20   portion of the complaint, under the title of "law enforcement's

21   investigation" where it describes generally how these sites

22   work and generally the reason why the operation of these

23   websites is profitable, why an entity such as Puerto 80 would

24   be seeking to receive the return of those domain names, why

25   it's important to them.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1c67rojm

1          The other point, your Honor, that I wanted to address

2     is the extraterritoriality point of the copyright law that Mr.

3     Tangri referred to.  And I think in the Second Circuit there is

4     pretty clear case law that it's not seriously disputed that

5     U.S. copyright laws do not have extraterritorial effect and

6     that infringing acts that take place entirely outside the

7     United States are not actionable.  However, the Second Circuit

8     has also recognized an exception where claims of U.S. copyright

9     law infringement can be based where at least in part there is a

10    predicate infringing act that occurs in the United States.

11          THE COURT:  Well, if I were to go on Rojadirecta, not

12    withstanding the fact that you seized .com and .org, I could

13    still get Rojadirecta, couldn't I?

14          MR. FREY:  Today, yes, you can.

15          THE COURT:  Here in the United States?

16          MR. FREY:  Here in the United States.  Not through

17    domain names that are controlled by any entity in the United

18    States.

19          THE COURT:  Well, why under your argument is this

20    subject to American jurisdiction if I can get it today in New

21    York?

22          MR. FREY:  Well, the government at this point in time

23    anyway does not have the ability to seize those domain names

24    that are registered through registrars overseas, but it does

25    have the ability to seize those domain names that are

1c67rojm

1    registered here in the United States.

2          THE COURT:  So your predicate for jurisdiction is the

3    same; your power to execute though is more limited because the

4    name is beyond the reach of the marshal.  Is that it?

5          MR. FREY:  Well, not only beyond the reach of the

6    marshal but beyond what Congress has authorized.  We have the

7    authority to seize property located here in the United States;

8    we don't have that same authority abroad.

9          But my point with the fact that there are certainly

10   inferences to be drawn at the very least from the complaint to

11   suggest that there are predicate infringing acts occurring here

12   in the United States is that what the government is concerned

13   with here is infringement on copyrighted material of U.S.

14   copyright holders.  And, again, those are the NBA games, the

15   NFL games, the NHL games, and those are broadcasts of events

16   that are occurring in the United States, broadcasts that are

17   more likely than not occurring here in the United States.  It

18   is a very likely inference that copies of those broadcasts are

19   being made here in the United States and are being sent

20   overseas.  But there are certainly enough inferences from what

21   is pled in the complaint to find that there are predicate

22   infringing acts here in the United States.

23         I also wanted to note to the court a case that I

24   recently came across, that is the Kamen case, a Second Circuit

25   decision, 791 F.2d 1006, that suggests that in resolving some

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1c67rojm

```
 1    of these jurisdictional questions or these questions of

 2    extraterritoriality, some limited discovery might be

 3    appropriate because there are often times questions for which

 4    the answers lie with the claimant.

 5            THE COURT:  Well, you are just about finished, Mr.

 6    Frey?  Because I have some questions for you.

 7            MR. FREY:  Yes, please.

 8            THE COURT:  Now, the prerequisites here for copyright

 9    is there has to be a valid copyright.  There is no dispute that

10    this material -- at least according to the allegations --

11    there's a valid copyright for it.  Then there has to be an act

12    of infringement which is willful on the part of the infringer.

13    Mr. Tangri makes the points that linking is not a direct

14    infringement, there is no criminal offense for contributory

15    infringement.  What do you say about those arguments?

16            MR. FREY:  Again, your Honor, I think we disagree

17    about the nature of the infringing act.  I think unauthorized

18    distribution is in fact an infringing act.  Certainly in the

19    criminal context there is no case in the Second Circuit that I

20    am aware of that rules out streaming from the concept of

21    distribution.  Again, not only though on the website are these

22    live feeds, but there is also the downloading of last matches,

23    which would seem to me to be an act of distribution.

24            THE COURT:  And what do you say about the argument

25    that linking is not direct infringement?
```

1c67rojm

1      MR. FREY:  I think under an aiding and abetting theory

2   it is.  I think it is direct infringement under an aiding and

3   abetting theory.

4      THE COURT:  And what about the argument that there is

5   no criminal offense for contributory infringement?

6      MR. FREY:  There is no statutory offense for

7   contributory copyright infringement.  There is certainly

8   general theories of secondary liability including aiding and

9   abetting, conspiracies.

10      THE COURT:  Yes.

11      MR. FREY:  And that is I think a theory that is

12   supported by the allegations in the complaint, your Honor.

13      THE COURT:  And what about Mr. Tangri's argument about

14   allegations of willfulness?  You concede, don't you, that you

15   really ought to replead willfulness?

16      MR. FREY:  I think that's fair, your Honor.  I think

17   the government would be able to do more than make a bare

18   allegation as to willfulness in pleading, but I also think that

19   beyond that question of willfulness and whether copyright

20   notices on the broadcasts themselves or whether the take-down

21   notices, if you will, that were provided to the websites such

22   as Rojadirecta that placed them on notice that they were

23   distributing infringing material and they should take those

24   down, and then that was never done, I think those will be

25   factual issues that will need to be resolved about whether or

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1c67rojm

1    not that is evidence of willfulness -- of intent.

2              THE COURT:  And where is Rojadirecta.com and .org's

3    financial gain?

4              MR. FREY:  Again --

5              THE COURT:  Under 506 there has to be some kind of

6    financial gain, doesn't there?  It has to be for purposes of --

7              MR. FREY:  -- purposes of commercial advantage and

8    financial gain.  There is certainly evidence -- and there is

9    some allude to, though not directly, with respect to

10   Rojadirecta, which is the linking sites in general -- that they

11   gained revenue from advertisements, but beyond that there is

12   also case law that they don't have to realize commercial gain.

13   If it was intended, if that was their purpose, then that is

14   sufficient.

15             You know, your Honor, there was a lot to be made in

16   Puerto 80's reply brief about what I will call the doomsday

17   scenario, that, you know, if the government's interpretation of

18   the forfeiture statute is what it is, then there is nothing

19   from stopping the government from seizing and shutting down

20   basically the Internet, from taking sites like -- Google, for

21   example is often a popularly cited example -- what's to stop

22   the government from taking Google.

23             Well, you know, the language of the forfeiture statute

24   is broad, but courts have recognized that the connection

25   between the property -- the Rojadirecta domain names in this

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1c67rojm

1    case, the Google domain case in the Google hypothetical -- and

2    the crime have to be more than de minimis.  And I don't think

3    there is any allegation or any plausible argument that what

4    Google does is substantially connected to infringing copyright

5    infringement.

6            THE COURT:  This is what you mean by the difference

7    between Google and the Rojadirecta is that Rojadirecta

8    purposefully aggregates extremely specific content and actively

9    organizes the material in a focused, logical manner.  This is

10   not what Google does.

11           MR. FREY:  Exactly, your Honor.  The displaying of

12   links is incidental to Google's services; it is not what

13   Rojadirecta does; it is not creating and updating on an hourly

14   or daily basis links to copyright infringing material.  And

15   Google has a continuing obligation to remove links when it

16   becomes aware that those links link to infringing material.

17   That is very different than what Rojadirecta does.

18           And I think that the court's recognition of that

19   substantial connection between the property at issue -- the

20   property that the government is seeking to forfeit -- and the

21   criminal offense, would prevent this doomsday scenario that

22   Puerto 80 is trying to flag for the court.

23           THE COURT:  All right.  Thank you.

24           Anything else, Mr. Frey?

25           MR. FREY:  No, your Honor, unless the court has

1c67rojm

 1   further questions.

 2          THE COURT:  Mr. Tangri?

 3          MR. TANGRI:  Yes, your Honor, if I may.

 4          On aiding and abetting, aiding and abetting is not a

 5   crime for which forfeiture is permitted under the statute under

 6   which the government is proceeding.  They are proceeding under

 7   Section 2323.  That statute enumerates certain crimes touching

 8   on the Copyright Act for which forfeiture may be permitted.

 9   Aiding and abetting is not among them.  And so we're back

10   respectfully a bit to the mixing and matching of theories and

11   actors.

12          THE COURT:  You base that argument as saying -- what

13   did you base that on?  It says under 2323(a) you have to cite a

14   violation to an enumerated statute?  Is that it?

15          MR. TANGRI:  Yes.

16          THE COURT:  And 2 is not among them?

17          MR. TANGRI:  Correct.  Nor is 371.  And there are

18   other forfeiture statutes, including 981 (a)(1)(A) and

19   (a)(1)(C) which do reference 371 or reference crimes which in

20   turn expressly incorporate 371.  So, it's not an oversight on

21   the part of Congress.  As Mr. Frey made the point, Congress has

22   given them certain authority and not more.  Aiding and abetting

23   doesn't support forfeiture in this context.  For other crimes

24   yes, not here.

25          On the distribution point, your Honor, we cited the

1c67rojm

1    law that says that streaming does not amount to a distribution,

2    and I think that's clear in this Circuit.

3         Mr. Frey has made reference to one line in the

4    complaint that says there is a button on the Rojas site or a

5    place on the Rojas site that says something about download

6    recent matches.  The theory of the complaint and the theory of

7    the opposition brief has been entirely around distribution by

8    streaming.  There is detailed allegations about streaming,

9    detailed allegations of facts about what the agents saw when

10   they were streaming.  It's all about streaming.  The complaint

11   doesn't plead and it can't be fairly read to plead this

12   downloading piece.  But if it did, the law is also clear here

13   that the website that makes material available for download --

14   and again that's not Rojadirecta; that's whatever they refer to

15   them as cyber locker sites where things are kept in the

16   government's complaint.  They make an express reference to

17   cyber locker sites.

18        THE COURT:  Tell me again what a cyber locker site is.

19   That's the actual server where the materials are stored?

20        MR. TANGRI:  Yes, that is a website that allows people

21   to store large file content like a sports telecast on the

22   website's own server and allows that person or others to

23   download it.  And they say Rojadirecta is not a cyber locker

24   site, they say it's a linking site, and then they talk about

25   the fact that it links to streaming sites, and they describe

1c67rojm

1    how that works.

2         But even if you were to conclude -- I mean even if you

3    want to look at the fact and say, OK, so somewhere there is a

4    cyber locker site -- we don't know what it is, and we haven't

5    really pled that Rojadirecta links to it, but maybe there is an

6    inference to be made there -- the argument then becomes is that

7    site engaged in infringement by having that material there

8    perhaps to be downloaded.  And the answer again under this

9    Circuit's precedence is, no.  The Cablevision case, as well as

10   the United States v. American Society of Composers, Authors and

11   Publishers, 627 F.3d 64 (2d Cir. 2010), hold that it's the

12   volitional act that must be taken to download something that

13   makes it a violation of the distribution right; it's not having

14   it available on a server to be downloaded.  Merely having

15   something available on a server to be downloaded is not

16   distribution under those precedents.

17        On the question whether they do or do not allege that

18   Rojadirecta has this material itself, I think the clearest

19   place in the complaint is paragraph 14(c), in which they allege

20   the content ran on a live stream from another website.

21        THE COURT:  I see that.

22        MR. TANGRI:  On the extraterritorial point, I just

23   want to be as clear as I can on the law.  It's different law

24   than the standard test for jurisdiction.  I think we're more

25   familiar, all of us, with the effects test where even under the

1    antitrust laws, for example, a conspiracy in Europe can affect

2    prices in the United States, and you can prosecute Europeans

3    under American law, or you can bring a civil claim under the

4    Sherman Act under American law.  That is a different concept

5    than the extraterritorial reach of a statute.

6          Congress has chosen to cause the Copyright Act to

7    apply only to acts of infringement taken within the United

8    States, not to have it apply to acts of infringement taken

9    abroad that may nevertheless may have an impact on the market

10   in the United States or the price of goods in the United States

11   or some other economic interest in the United States.

12         The actus reus has to take place here, and that's what

13   is not alleged, and I believe people recognize that the actual

14   infringement is happening -- the hosting of this material is

15   being hosted on servers outside the United States.

16         THE COURT:  How do we know that?

17         MR. TANGRI:  Well, we know that it's not alleged in

18   the complaint to be done within the United States.  I mean that

19   is within the four corners of the 12(b)(6) procedure what we

20   know at this point.

21         I believe that there are allegations in the complaint

22   that Rojadirecta's own server is located in Canada.  That again

23   isn't where the infringing material is; that's just where the

24   links are.  But the only server that's alleged is one that's

25   out of the country.  And there is no allegations about the

1c67rojm

1    locations of the servers that actually host the infringing

2    content that are maintained by these unidentified third-party

3    streaming sites.  But in the absence of such an allegation, and

4    given the other allegations in the complaint --

5            THE COURT:  It's a very strange world where assuming

6    that the NHL has copyrights to its hockey games, and they are

7    played here in the United States and broadcast here in the

8    United States, somebody picks them up in a server in Canada,

9    and another server in Kazakhstan, and then rebroadcast, picked

10   up here in the United States by virtue of computers, so you

11   would say there would be no remedy for that kind of copyright

12   infringement because all the infringing acts took place outside

13   the United States?

14           MR. TANGRI:  I'm not saying exactly that, your Honor.

15           THE COURT:  Even though the damages occurred

16   exclusively in the United States.

17           MR. TANGRI:  It may well be, your Honor, that there is

18   a remedy.  As I said, there are civil remedies for secondary

19   copyright infringement, vicarious, contributory inducement.

20   There are the civil copyright laws.

21           THE COURT:  No, I am talking about criminal

22   enforcement.

23           MR. TANGRI:  The criminal law, Congress has chosen to

24   make it more narrow and not to include -- other than perhaps

25   under Section 2 or Section 371 -- but not to include criminal

1c67rojm

1    liability for secondary infringement, and has chosen not to

2    include Sections 2 and 371 in the forfeiture statute.  Those

3    are all choices that Congress has made.

4              THE COURT:  Anything else?

5              MR. TANGRI:  Your Honor, just that on this point about

6    sort of the purposefully indexing things and maintaining an

7    up-to-date list of links to this content, that is, with all

8    respect, precisely what a search engine does only more so.

9              When you go to Yahoo or Microsoft's Bing, or any other

10   search engine, and you enter your query, the page that you get

11   back is a page of links.  That's what it is.  And you click on

12   one of those links, and it takes you to somewhere.  It does

13   purposefully, it does it in response to your query, and it does

14   it on an even more up-to-date basis than perhaps Rojadirecta,

15   because they are constantly crawling and indexing the Internet,

16   and it's returning the results in real time.  So, what

17   everyone's vision --

18             THE COURT:  There is a difference though, isn't there?

19   I mean normally when you have an inquiry, you type it into your

20   search engine, and it comes back with a series of links.  Here

21   with Rojadirecta, as I understand it, based on the pleadings

22   and what you have submitted, what Rojadirecta offers you is a

23   series of links right away.

24             MR. TANGRI:  Which is the same thing that Google News

25   offers you, which is the same thing that a lot of Yahoo forum

1c67rojm

pages offer you.  A lot of these big portal sites, or any site
that aggregates, a lot of them have preset menus, if you will,
and then you can do a custom order by simply typing in your
search result, and then they will return you a series of
indexed links that are highly relevant to your particular
query.

THE COURT:  All right.  I appreciate the argument and
the clarity of the briefs by Mr. Frey and Mr. Miller and you,
Mr. Tangri, and your colleague Mr. Spears.  I have read the
party's briefs, and I have considered their arguments.  I am
now going to rule on the motion to dismiss.

The government seeks forfeiture of Rojadirecta Domain
Names, pursuant to 18 U.S.C. 2323 (a)(1)(A) and (B).  The
government alleges that the Rojadirecta Domain Names constitute
"property used, or intended be used" to "facilitate" the
commission of criminal copyright infringement in violation of
17 U.S.C. section 506 and 18 U.S.C. Section 2319.

To establish criminal infringement of copyright work,
the government has to show the following factors:  First, the
existence of a valid copyright; second, an act of infringement
of that copyright; three, willfulness on the part of the
infringer; and, four, either that (a) the infringement was for
the purpose of commercial advantage or private financial gain,
or (b) the infringer reproduced or distributed during any
180-day period one or more copies or phonorecords of one or

1c67rojm

```
 1   more of the copyrighted works, with a total retail value of

 2   more than $1,000.  That's set forth at 17 U.S.C. Section

 3   506(a).

 4        The government has sufficiently alleged the existence

 5   of a valid copyright to satisfy the first element.  I don't

 6   think there is any dispute about that.

 7        With respect to the second element, an "act of

 8   infringement," the government alleges that Rojadirecta Domain

 9   Names "purposefully aggregated extremely specific [illegal]

10   content and actively organized the material in a focused,

11   logical manner."  The government's allegations at this stage

12   are sufficient to show direct infringement because the Domain

13   Names conduct involved a volitional aspect.  Even if criminal

14   copyright infringement cannot be based on allegations of

15   "contributory infringement" -- and I do not so hold -- the

16   government's allegations are still adequate.  The government

17   alleges that Rojadirecta Domain Names disseminated the

18   copyrighted works by providing links which when clicked took

19   the user to a new window bearing the URL "rojadirecta" that

20   broadcast unlawful copies of live streaming sports events from

21   another website.  This is a sufficient allegation at this

22   juncture that Rojadirecta Domain Names distributed the

23   copyrighted works.  That's in paragraph 14(c) of the complaint.

24        The government has not, however, sufficiently alleged

25   that Rojadirecta Domain Names willfully infringed the
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1c67rojm

1  copyright.  The government argues that it can show willfulness

2  by alleging the that copyright owners provided notice to

3  Rojadirecta Domain Names requesting removal of the illegally

4  posted content, and that despite this notice, the Domain Names

5  continued to organize links to copyrighted athletic events.

6  The government concedes that the complaint does not actually

7  allege that the Domain Names or Puerto 80 received notice and

8  that it may be preferable to amend the complaint to so state.

9  Without these factual allegations, there is no basis to find

10  that the Domain Names acted willfully.

11       The government has sufficiently alleged that the

12  Domain Names' purported infringement was for the purposes of

13  commercial advantage or private gain.  Indeed, with respect to

14  the purposes of commercial advantage, it's the word "purposes"

15  that is important here, and money does not have to be earned,

16  but at least at this stage, giving the benefit of the doubt to

17  the pleadings and making all the assumptions in favor of the

18  government at this time in response to the motion to dismiss, I

19  don't know what other purpose there would be other than some

20  kind of commercial purpose.

21       At any rate, the government alleges an allegation that

22  when a link from the Domain Names' sites is accessed,

23  advertisements that were separate and distinct from any

24  commercials that may have been aired during the streaming of

25  the sporting events were periodically displayed at the bottom

1c67rojm

```
 1   of the video during the live stream is more than sufficient to

 2   establish that the infringement was for the purposes of

 3   commercial advantage or providing financial gain.  The court

 4   also notes that Puerto 80 previously argued that the seizure of

 5   the Domain Names caused "a substantial hardship" on Puerto 80's

 6   lawful business in the United States.

 7             In light of the defendants' prior argument seeking the

 8   release of the Domain Names, that its business in the United

 9   States was substantially impacted, the court finds at least at

10   this stage the defendants' current arguments on

11   extraterritoriality are not consistent, and in any event at

12   this particular stage they are unsound.  The government has

13   alleged that the Domain Names were registered in Arizona; and

14   provided links to illegal broadcasts of U.S. sporting events,

15   which were accessible to viewers in the United States.

16   Accordingly, the alleged infringement is sufficiently connected

17   to the United States to render it actionable.

18             Finally, the court will not consider, as I have

19   already indicated, defendants' first amendment arguments for

20   the reasons I have already stated on the record.  In light of

21   the government's failure to adequately allege willfulness, the

22   court grants the defendant's motion to dismiss.  The court

23   finds, however, that it is in the interests of justice, and

24   pursuant to Rule 15(a) of the Federal Rules of Civil Procedure,

25   to grant the government leave to replead.
```

1c67rojm

1          The government has to replead within how much time do

2     you want, Mr. Frey?

3          MR. FREY:  May I have a moment, your Honor?

4          THE COURT:  Yes.  I am thinking 30 days, Mr. Frey.

5          MR. FREY:  That would be fine, your Honor.

6          THE COURT:  30 days to replead.

7          I think then you and Mr. Tangri ought to talk about

8     some discovery.  There may be a motion for summary judgment.

9          What do you foresee as the next step, Mr. Frey?

10         MR. MILLER:  Your Honor, assuming that the court

11    accepts the revised complaint which the government will file,

12    we will confer with opposing counsel regarding a discovery

13    schedule, and we would be prepared to propose one under I guess

14    a Rule 16 conference, and then subsequently Rule 26 initial

15    disclosures, and then ultimately envision document requests and

16    depositions including of foreign sources of documents and

17    possibly foreign witnesses.  So, we anticipate from a discovery

18    perspective that this could take a number of months given the

19    possibility that evidence could be located abroad.

20         THE COURT:  I will take a look at your schedule but

21    I'm not going to let this case hang around for a long time.

22    Mr. Tangri is entitled to an answer on his client's behalf.

23    When was this matter started?  In the summer?

24         MR. FREY:  June the complaint was filed.

25         THE COURT:  The seizure was back in February.

1c67rojm

1          MR. FREY:  Sorry, your Honor?

2          THE COURT:  The seizure was back in February.

3          MR. FREY:  Yes, it was.

4          THE COURT:  I think Mr. Tangri is entitled to an

5    answer.  So, I will just take a look, but you should keep that

6    in mind.  That's my inclination on this matter, to move this

7    along promptly and not engage in a lot of discovery, because

8    Rojadirecta.org and .com are entitled to an answer.  OK, thank

9    you very much.

10          MR. FREY:  Thank you, your Honor.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25