UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA                          :

        - v. -                          :

THE FOLLOWING DOMAIN NAMES:           :

ROJADIRECTA.ORG, and
ROJADIRECTA.COM,                          :

        Defendants-in-rem.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

11 Civ. 4139 (PAC) (FM)

ECF Case

 

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
CLAIMANT PUERTO 80 PROJECTS, S.L.U.'s MOTION
TO DISMISS THE AMENDED COMPLAINT**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Christopher D. Frey
Andrew D. Goldstein
Jean-David Barnea
Assistant United States Attorneys
    - Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      LEGAL STANDARD ON A MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     THE AMENDED COMPLAINT SUFFICIENTLY PLEADS THAT THE
        ROJADIRECTA DOMAIN NAMES WERE USED TO FACILITATE THE
        COMMISSION OF CRIMINAL COPYRIGHT INFRINGEMENT . . . . . . . . . . . . . . . . . . . . . 8

        A.      The Amended Complaint Alleges the Commission of Copyright Infringement
                Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.      The Amended Complaint Alleges that the Rojadirecta Domain Names
                Facilitated that Criminal Copyright Infringement . . . . . . . . . . . . . . . . . . . . . . . . 13

III.    PUERTO 80's REMAINING ARGUMENTS SHOULD BE WHOLLY REJECTED . . . . . . . 16

        A.      The Government's Seizure of the Rojadirecta Domain Names Does Not Run
                Afoul of the First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                1.      The Government's Seizure Is Not a Prior Restraint . . . . . . . . . . . . . . . . . . . . 18

                2.      Extraordinary Procedural Protections Are Required Only for Classic
                        Prior Restraints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                3.      The Government's Seizure Survives Traditional First Amendment
                        Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.      The Amended Complaint Sufficiently Alleges Infringing Acts in the
                United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

The Government respectfully submits this memorandum of law in opposition to the motion by claimant Puerto 80 Projects, S.L.U. ("Puerto 80") to dismiss the Government's verified amended complaint (the "Amended Complaint"), pursuant to Federal Rule of Civil Procedure 12(b)(6) and Rule G(8)(b) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Motion").  For the reasons set forth below, the Motion should be denied in its entirety.

## PRELIMINARY STATEMENT

Puerto 80's Motion is based on a deeply flawed conception of the nature of this action and a fundamental misunderstanding of the forfeiture laws upon which it is based.  Here, the Government has commenced an in rem civil action against certain property – specifically, two domain names.  The plain text of the statutory authority upon which the Amended Complaint's forfeiture claim is based requires only that the Government allege (1) the commission of a copyright infringing offense; and (2) that the property at issue facilitated a violation of those criminal laws.  The Amended Complaint does both, thereby rendering the defendant property subject to forfeiture to the United States Government. Moreover, the conduct of Puerto 80, as the owner of the defendant property, is simply irrelevant to this action.  This is so because the Government is neither criminally charging nor civilly suing Puerto 80 or any one of its officers.  Puerto 80's attempt to muddle the analysis simply cannot undo the fact that the Amended Complaint more than adequately states a claim upon which relief may be granted, and the arguments Puerto 80 advances in its Motion should be wholly rejected.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

This civil forfeiture action names two Internet domain names – rojadirecta.com and rojadirecta.org (collectively, the "Rojadirecta Domain Names") – as defendants in rem.  Both of these defendant domain names were seized by the U.S. Department of Homeland Security on or about February 1, 2011, pursuant to a warrant issued in the Southern District of New York by the Honorable Frank Maas, United States Magistrate Judge, who found probable cause to believe that these domain names were

1

subject to forfeiture because they had been used to commit and facilitate criminal copyright infringement and because they contained evidence of that crime. (Amended Complaint ¶ 23).

By way of background, a domain name is a simple, easy-to-remember way for humans to identify computers on the Internet. (Id. at ¶ 14). The Domain Name System ("DNS") is, among other things, a hierarchical convention for domain names, and DNS servers are computers connected to the Internet that convert domain names that are easy for humans to remember into Internet Protocol ("IP") addresses, which are unique machine-readable numeric addresses that computers use to identify each other on the Internet. Every computer connection to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination. DNS servers can be said to "resolve" or "translate" domain names into IP addresses. (Id.). For each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address. The registry for the ".com" top-level domain is Verisign, Inc., located in Mountain View, California. The registry for the ".org" top-level domain is The Public Interest Registry, located in Reston, Virginia.[1] (Id. at ¶ 15). The Rojadirecta Domain Names are both registered with GoDaddy.com, Inc., a popular registrar, located in Scottsdale, Arizona. The registry for rojadirecta.com is VeriSign, Inc., while the registry for rojadirecta.org is the Public Interest Registry. (Id. at ¶ 17a). Puerto 80 is the registrant and owner of the Rojadirecta Domain Names. (See Docket Entry No. 44).

Prior to February 1, 2011, the Rojadirecta Domain Names directed Internet users to a website commonly known as "Rojadirecta." (Amended Complaint ¶ 17b). Rojadirecta is a "linking" website[2]

---

[1]    If an individual or business wants to purchase a domain name, they buy it through a company called a "registrar." The registrar, in turn, communicates this purchase to the relevant registry. The individual or business who purchases, or registers, a domain name is called a "registrant." (Amended Complaint ¶ 16).

[2]    Linking websites are extremely popular because they allow users to quickly browse content and locate illegal streams that would otherwise be more difficult to find through individual

2

that collected and catalogued links to files on third-party websites that contained illegal copies of copyrighted daily live sporting events and Pay-Per-View events, as well as to downloadable sporting events or Pay-Per-View events that had been previously aired.  (Id. at ¶¶ 17b, 17d).  More specifically, Rojadirecta's homepage displayed three general categories of links to available content: (1) "Today on Internet TV"; (2) "Download last full matches"; and (3) "Last video highlights."  (Id. at ¶ 17e; Ex. A).  Links for daily sporting events were displayed under the "Today on Internet TV" category header.  The links under the "Today on Internet TV" category header changed on a daily basis; links were added as the day progressed and an event's start time drew closer.  The sporting events and their starting times corresponded to individual sporting leagues' official events and starting times.  (Id. at ¶ 17f).

When a user selected a link for a particular sporting event under the "Today on Internet TV" category header, the type of link, the name of the broadcasting station (e.g., ESPN), the language option, and the type of Internet media player were subsequently displayed.  Users of the Rojadirecta website could simply click on a particular link to begin the process of streaming to their own computer an illegal broadcast of a sporting event or Pay-Per-View event from the third-party website that hosted the stream.  (Id. at ¶ 17g).  In fact, once a user selected a specific link option, that user was then taken to a new window, which displayed the selected program and bore a Uniform Resource Locator, or "URL,"[3] containing the words "rojadirecta."  Because the content ran on a live stream from another website, the selected show did not start at the beginning of the program; instead, the program ran from whatever particular point the show was presently at in the stream.   The event broadcast was shown in real time and was the same broadcast as the authorized broadcast of that same event.  In addition, advertisements that were separate and distinct from any commercials that may have been aired during the stream of the

---

manual searches of the Internet.  (Id. at ¶ 13).

[3]        A URL, which is often colloquially referred to as a "link," is code that specifies a particular webpage or file on the Internet.  For example, "http://movies.nytimes.com" is the URL for the webpage containing the New York Times' reviews of various movies.

3

sporting event broadcast were periodically displayed at the bottom of the video during the live stream. (Id.).

The holder of the copyrights to all television broadcasts and other footage of any given athletic event is the associated individual sports league. The U.S. Copyright Act, Title 17, United States Code, Sections 101, et seq., gives the holder of such copyrights various exclusive rights, including the right to control public performances as well as the rights to reproduce and to distribute the works. In turn, the copyright holding sports leagues enter into contractual arrangements with television networks, which pay the leagues fees for the rights to broadcast telecasts of their copyrighted sporting events. (Id. at ¶ 7). At no time prior to the February 1, 2011 seizure did the various copyright holding sports leagues authorize the broadcasts of their copyrighted sporting events that were made available through the Rojadirecta website when accessed via the Rojadirecta Domain Names. (Id. at ¶ 17g).

Piracy of live sports broadcasting results in significant harm to the relevant copyright holders, while websites such as Rojadirecta profit from such intellectual property theft, often by generating revenue through advertisements that appear in some way on their webpages. (Id. at ¶¶ 8, 10, 22). To combat such activity, the copyright holding sports leagues and the broadcasting networks invest significant resources to monitor instances of piracy and provide notifications to Internet service providers and the websites themselves, requesting the removal of illegally posted content and advising of alleged infringing behavior. (Id. at ¶ 9). Indeed, the Rojadirecta website itself was repeatedly the subject of such notices, warning that the Rojadirecta Domain Names were engaging in copyright infringing activity. Notwithstanding these notices and warning, the Rojadirecta website continued to operate and make available copyright infringing content to its users. (Id. at ¶¶ 19, 21).

On June 17, 2011, the United States commenced this in rem civil action by filing a verified complaint, which Puerto 80 thereafter sought to dismiss. On December 7, 2011, the Court granted Puerto 80's motion to dismiss the Government's complaint with leave to amend, finding the complaint to be

deficient only with respect to its allegations of willfulness. (See Dec. 6, 2011 Transcript of Oral

Opinion). On January 6, 2012, the Government filed its Amended Complaint, seeking forfeiture of the

Rojadirecta Domain Names pursuant to Title 18, United States Code, Sections 2323(a)(1)(A)-(B) as

property used, or intended to be used, to commit or facilitate the commission of criminal copyright

infringement in violation of Title 17, United States Code, Section 506 and Title 18, United States Code,

Section 2319. To this day, the Rojadirecta website remains available and fully accessible on the Internet,

despite the Government's seizure of the Rojadirecta Domain Names in February 2011, through the

alternative domain names rojadirecta.es, rojadirecta.me, and rojadirecta.in, among others. (Amended

Complaint ¶ 24).

## ARGUMENT

## I.   LEGAL STANDARD ON A MOTION TO DISMISS

Under Rule 12(b)(6), a complaint will be dismissed if it "fail[s] to state a claim upon which relief

can be granted." Fed. R. Civ. P. 12(b)(6). In two fairly recent decisions, the United States Supreme

Court revisited the pleading requirements necessary to survive a motion to dismiss under Rules 8 and

12(b)(6). See Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544

(2007). Generally speaking, a Rule 12(b)(6) motion to dismiss should be granted only if the complaint

does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570); see also id. at 1953 ("Our

decision in Twombly expounded the pleading standard for 'all civil actions' . . .") (quoting Fed. R. Civ.

P. 1). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949;

accord Twombly, 550 U.S. at 556. "Factual allegations must be enough to raise a right to relief above

the speculative level . . . on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)." Twombly, 550 U.S. at 555.

In a civil forfeiture action, the complaint must comply with the pleading requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.[4] Rule G(2) requires, among other things, that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Rule G(2)(f). Thus, the standard to be applied to a civil forfeiture complaint is more stringent than the notice pleading requirements of the Federal Rules of Civil Procedure. See, e.g., United States v. Daccarett, 6 F.3d 37, 47 (2d Cir. 1993).

The Government is not, however, required to have sufficient evidence at the time it files its complaint to establish the forfeitability of property. The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 106 Pub. L. No. 185, 114 Stat. 202 (2000), codified in part at 18 U.S.C. § 983, makes clear that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); see also Rule G(8)(b)(ii) ("In an action governed by 18 U.S.C. § 983(a)(3)(D) the complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property. The sufficiency of the complaint is governed by Rule G(2)."); 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture.").

Nor is the Government required to show probable cause for forfeiture. See, e.g., Daccarett, 6 F.3d at 47. Instead, the complaint simply needs to establish a "reasonable belief" that the government will be able to meet its burden at trial. Id. "In other words, the complaint need not allege facts sufficient

---

[4]    Supplemental Rule G, which became effective December 1, 2006, provides that, "[t]o the extent that [Rule G] does not address an issue, Supplemental Rules C and E and the Federal Rules of Civil Procedure also apply." Rule G(1).

to show that specific property is tainted, but facts sufficient to support a reasonable belief that the government can demonstrate" the ultimate trial burden "for finding the property tainted." Id. Stated differently, the Government must plead "the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." United States v. Mondragon, 313 F.3d 862, 865-67 (4th Cir. 2002) (quoting Supplemental Rule E(2)(a)).[5]

When considering a Rule 12(b)(6) motion to dismiss, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007) (quoting Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)). The trial court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003) (internal quotation marks and citations omitted); see also United States v. $15,270,885.69 Formerly on Deposit in Account No. 8900261137, No. 99 Civ. 10255 (RCC), 2000 WL 1234593, at *5 (S.D.N.Y. Aug. 31, 2000) (motion to dismiss may not be used to test the sufficiency or admissibility of the evidence). "[T]he issue is not whether a plaintiff will ultimately prevail but whether [it] is entitled to offer evidence to support the claims." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks and citations omitted). In determining whether a complaint's allegations are sufficient, matters outside the complaint, such as the claimants' factual contentions, are not considered. See United States v. All Funds on Deposit at Citigroup Smith Barney Account No. 600-00338, No. 06-CV-3730 (NGG), 2008 WL 3049895, at *5 (E.D.N.Y. Aug. 1, 2008)

---

[5]    Prior to the adoption of Rule G, courts applied the pleading standard in Supplemental Rule E(2)(a) – which governs maritime and admiralty actions – to civil forfeiture actions. The Advisory Committee Notes to Rule G state that "application of this standard to civil forfeiture actions has evolved to the standard stated in [Rule G(2)(f)]." Citing Mondragon, the Advisory Committee Notes state that Rule G(2)(f) "carries this forfeiture case law forward without change."

("On a motion to dismiss, the district court's consideration is 'limited to the factual allegations in [the] amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff [ ] had knowledge and relied on in bringing suit.'") (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)) (alterations in original); United States v. All Funds on Deposit in, or Transferred to or Through, Banc of America Account No. 207-00426, No. CV-05-3971 (SJF), 2007 WL 2114670, at *3 (E.D.N.Y. July 16, 2007).

## II.   THE AMENDED COMPLAINT SUFFICIENTLY PLEADS THAT THE ROJADIRECTA DOMAIN NAMES WERE USED TO FACILITATE THE COMMISSION OF CRIMINAL COPYRIGHT INFRINGEMENT

As set forth clearly in the Amended Complaint, the Government seeks forfeiture of the Rojadirecta Domain Names pursuant to Title 18, United States Code, Section 2323(a)(1), which provides, in relevant part:

> The following property, is subject to forfeiture to the United States Government:
> (A) Any article, the making or trafficking of which is, prohibited under section 506 of Title 17, or section 2318, 2319, 2319A, 2319B, or 2320, or chapter 90, of this title.
> (B) Any property used, or intended to be used, in any manner or part to commit or facilitate the commission of an offense referred to in subparagraph (A).

18 U.S.C. § 2323(a)(1)(A)-(B).  Section 506(a) of Title 17, in turn, provides:

> (1) In general. – Any person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed –
> (A) for purposes of commercial advantage or private financial gain;
> (B) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000; or
> (C) by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution.

8

17 U.S.C. § 506(a).  Thus, the operative questions are: (1) did any offense occur under 17 U.S.C. § 506?; and (2) did the Rojadirecta Domain Names <u>facilitate</u> the commission of that offense?  As discussed in further detail below, the Rojadirecta Domain Names are subject to forfeiture pursuant to Section 2323(a)(1)(B) of Title 18, because they were used to facilitate the commission of criminal copyright infringement, in violation of Title 17, United States Code, Section 506 and Title 18, United States Code, Section 2319.

Puerto 80's assertion that it is not itself directly liable for copyright infringement is wholly beside the point and utterly irrelevant to the fundamental question before this Court of whether the Rojadirecta Domain Names should be forfeited.  (<u>See</u> Puerto 80 Br. at 7-9).  Under well-established law, it is the role in the alleged offense of the defendant property – and the property alone – that is the focus of the forfeiture claim.

A.      **The Amended Complaint Alleges the Commission of Copyright Infringement Offenses**

Title 17, United States Code, Section 506(a) provides in relevant part that "[a]ny person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed for purposes of commercial advantage or private financial gain."  17 U.S.C. § 506(a)(1)(A).[6]  "Though the Government's burden in a criminal copyright infringement case is to persuade beyond a reasonable doubt, [there is] no reason why the elements to be proven are more than those in a civil copyright infringement case – ownership of a valid copyright and copying."  <u>United States v. Larracuente</u>, 952 F.2d 672, 673 (2d Cir. 1992).  Infringement of a valid copyright occurs "by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the copyright holder."  <u>Island Software and Computer Service, Inc.</u> v. <u>Microsoft Corp.</u>, 413 F.3d 257, 260 (2d Cir. 2005) (citing <u>Lipton</u> v. <u>Nature Co.</u>,

---

[6]      Notably, Puerto 80 does not – because it cannot – claim that the Amended Complaint insufficiently pleads that the infringement was for purposes of commercial advantage or private financial gain.  <u>See, e.g.,</u> Amended Complaint ¶¶ 8, 22 (alleging how revenue is generated through advertising).

9

71 F.3d 464, 469 (2d Cir. 1995)).  Among the exclusive rights that the Copyright Act bestows upon copyright owners are the right to perform the copyrighted work publicly, see 17 U.S.C. § 106(4), and the rights to reproduce and/or to distribute the copyrighted work.  See 17 U.S.C. §§ 106(1) and 106(3).

The Amended Complaint leaves little doubt that the offense of criminal copyright infringement has been committed.  Indeed, the Amended Complaint contains allegations of two infringing offenses under the Copyright Act — infringement of (1) the copyright holders' exclusive rights to control public performances; and (2) their exclusive rights of distribution.  With respect to the exclusive right to control public performances, on more than one occasion, the Second Circuit has held streaming to constitute a public performance, and has concluded that streaming without authorization violates the Copyright Act.  For example, in considering what constitutes a public performance under the Copyright Act in the context of musical works, the Second Circuit in United States v. ASCAP, 627 F.3d 64 (2d Cir. 2010), concluded that "[a] stream is an electronic transmission that renders the musical work audible as it is received by the client-computer's temporary memory.  This transmission, like a television or radio broadcast, is a performance because there is a playing of the song that is perceived simultaneously with the transmission."  Id. at 74.  The Second Circuit grounded its finding in the unambiguous statutory language of 17 U.S.C. § 101, which "states that '[t]o "perform" . . . a motion picture or other audiovisual work . . . [is] to show its images in any sequence or to make the sounds accompanying it audible.'"  Id. at 73.  See also Agee v. Paramount Communications, Inc., 59 F.3d 317, 325 (2d. Cir. 1995) (finding satellite transmissions of copyrighted works to constitute public performances, noting that "a number of courts have held that '[t]ransmissions by a cable network or service to local cable companies who in turn transmit to individual cable subscribers constitute "public performances" by the network under [the Copyright Act].'"); Warner Bros. Entertainment, Inc. v. WTV Systems, Inc., 2011 WL 4001121, at *5 (C.D. Cal. Aug. 1, 2011) ("In this case, Defendants are violating Plaintiffs' exclusive right to publicly

perform their Copyrighted Works by transmitting those Copyrighted Works to the public over the internet, without a license or Plaintiffs' permission . . . .").

The Amended Complaint clearly alleges that the unauthorized streaming of copyrighted sporting events infringes the various copyright holders' public performance rights — one of the exclusive rights specifically enumerated by the Copyright Act. See 17 U.S.C. § 106(4). First, there can be no dispute that the various individual sports leagues hold valid copyrights to all television broadcasts and other footage of their athletic events. (Amended Complaint ¶ 7). Nor can there be any dispute that the Copyright Act grants these leagues "various exclusive rights, including the right to control public performances, and the rights to reproduce and distribute their works." (Id.). Moreover, the Amended Complaint is replete with detail concerning the infringing conduct at issue. See Amended Complaint ¶ 13 ("Users simply click on a link to begin the process of downloading or streaming to their own computer an illegal broadcast of a sporting event or Pay-Per-View event from the third-party website that is hosting the stream."); id. at ¶ 17e ("At all relevant times, the homepage of the Rojadirecta Website displayed three general categories of aggregated and organized links to content available for viewing: (1) 'Today On Internet TV'; (2) 'Download Last Full Matches'; and (3) 'Last Video Highlights.' Links for daily live sporting events were displayed under the 'Today on Internet TV' category header."); id. at ¶ 17g ("Once a user selected a specific link option, a new window appeared, which displayed the selected program and bore a URL containing the words "rojadirecta." Because the content ran on a live stream from another website, the selected broadcasts did not necessarily start from its beginning; instead, the broadcast ran from whatever particular point it was presently at in the stream."). See also id. at ¶¶ 18, 20 (setting forth law enforcement's selected viewing of streamed sporting event broadcasts). Finally, as the Amended Complaint makes clear, none of the content at issue was made available on the Internet with the authorization of the relevant copyright holders. See id. at ¶¶ 17g, 19a, 21a.

Second, the Amended Complaint clearly alleges a second and separate violation of the Copyright

Act, namely infringement of the copyright holders' exclusive distribution rights. See 17 U.S.C. § 106(3);

see also Perfect 10, Inc. v. Amazon, com, Inc., 487 F.3d 701, 718 (9th Cir. 2007) (stating the principle

that distribution requires an actual dissemination of a copy and noting that "[t]he Supreme Court has

indicated that in the electronic context, copies may be distributed electronically."); Arista Records, Inc.

v. MP3Board, Inc., 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002) (noting that an unlawful copy

must be disseminated to show unlawful distribution).  The Amended Complaint includes several

allegations related to the links to copyrighted content aggregated and organized under the "Download

Last Full Matches" section of the Rojadirecta website's homepage, (see Amended Complaint ¶ 17e; Ex.

A), clearly alleging that the Rojadirecta Domain Names also made "links to . . . downloadable broadcasts

of sporting events or Pay-Per-View events that had been previously aired" available.  (Id. at ¶ 17d).

Viewing these allegations in the light most favorable to the plaintiff, this Court may fairly draw the

inference that the copyright holders' exclusive right of distribution has been infringed as well.  The

Amended Complaint thus alleges that at least two of the exclusive rights that belong to the relevant

copyright holders have been infringed.[7]

---

[7]     Puerto 80's argument that the Amended Complaint is deficient in its pleading of
criminal intent should be rejected. (Puerto 80 Brief at 12-15).  For one thing, it is not Puerto 80's intent
that is relevant.  Because this is an action in rem, the focus is on the actions of the defendant property.  In
any event, the Amended Complaint alleges sufficient evidence of willfulness.  There is no dispute that
the sporting event broadcasts at issue are copyright-protected. (Amended Complaint ¶ 7).  And while
those engaged in the illegal streaming of such broadcasts certainly know they lack authorization to do so,
time and time again, the copyright holders have provided written notices unequivocally asserting that
such activity is infringing and requesting that all unauthorized use of copyrighted content cease
immediately. (Id. at ¶¶ 9, 19b, 21b).  Indeed, the Rojadirecta Domain Names were repeatedly noticed
that they were linking to copyright infringing content. (Id. at ¶¶ 19b, 21b).  In the criminal context, the
Second Circuit has been clear that "[t]he standard is simply whether the defendant had knowledge that its
conduct represented infringement or perhaps recklessly disregarded the possibility." Twin Peaks Prods.,
Inc. v. Publ'ns Int'l, Ltd., 996 F.2d 1366, 1382 (2d Cir. 1993).  Courts in this District and elsewhere have
held such explicit forms of notice to be sufficient evidence to support a finding of knowledge and
willfulness. See, e.g., Castle Rock Entertainment v. Carol Pub. Group, Inc., 955 F. Supp. 260, 267
(S.D.N.Y. 1997) (holding that fact that plaintiff's copyrighted works had copyright notices weighed
heavily in determining willfulness of defendant's infringement); Arista Records v. Becker Enters., 298 F.

12

**B.     The Amended Complaint Alleges that the Rojadirecta Domain Names Facilitated that Criminal Copyright Infringement**

Because the Amended Complaint sufficiently alleges copyright offenses, the second operative question is <u>not</u> whether Puerto 80's linking to material available elsewhere on the Internet makes it directly liable for copyright infringement, nor is it whether Puerto 80 has aided and abetted or conspired to commit copyright infringement.  Under the clear language of the applicable forfeiture statute, the operative question is simply whether the Rojadirecta Domain Names <u>facilitated</u> the commission of the alleged copyright offenses.  <u>See</u> 18 U.S.C. § 2323(a)(1)(B).

"A facilitation of the underlying crime implies that the property need only make the prohibited conduct 'less difficult' or 'more . . . free from obstruction or hinderance [sic].'" <u>United States</u> v. <u>Eleven Vehicles</u>, 898 F. Supp. 1143, 1149 (E.D. Pa. 1995) (citing <u>United States</u> v. <u>One 1977 Lincoln Mark V. Coupe</u>, 643 F.2d 154, 157 (3d Cir. 1981)).  "At minimum, the property must have more than an incidental or fortuitous connection to criminal activity." <u>United States</u> v. <u>Schifferli</u>, 895 F.2d 987, 990 (4th Cir. 1990).  "It is also irrelevant whether the property's role in the crime is integral, essential or indispensable." <u>Id</u>.

Puerto 80's contention that the Government's allegations do not "make out a claim of criminal copyright infringement against Puerto 80, and thus its forfeiture complaint fails" wholly misinterprets the nature of this action.  (Puerto 80 Br. at 4).  Because a civil forfeiture action is <u>in rem</u>, the elements of a claim establishing forfeiture focus on the <u>property's role</u> in the offense and not on the <u>owner's conduct</u>. <u>United States</u> v. <u>Chandler</u>, 36 F.3d 358, 362 (4th Cir. 1994).  The Government is not required to prove

---

Supp. 2d 1310, 1313 (S.D. Fla. 2003) (finding willfulness when "Plaintiffs repeatedly contacted Defendants regarding their infringing conduct and Defendants ignored Plaintiff's communications"); <u>Louis Vuitton Malletier & Oakley</u> v. <u>Veit</u>, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002) ("[w]illfulness can be inferred by the fact that a defendant continued infringing behavior after being given notice.").  Thus, viewing the allegations of the Amended Complaint in the light most favorable to the Government — as the Court must — at a minimum, the requisite <u>mens rea</u> of the alleged infringement can be fairly inferred from the allegations of the Amended Complaint taken as a whole.

the involvement of the property owner in the commission of the offense giving rise to the forfeiture.  Id.
In fact, property may be forfeited when a crime was committed by a non-owner or when the perpetrator
of the offense is unknown.  United States v. One 1987 Jeep Wrangler Auto., 972 F.2d 472, 476 (2d Cir.
1992).[8]

       The Amended Complaint clearly alleges that the Rojadirecta Domain Names resolved to the
Rojadirecta website, which collected and catalogued links to files on third-party websites that contained
illegal copies of copyrighted daily live sporting events and Pay-Per-View events, as well as to
downloadable sporting events or Pay-Per-View events that had been previously aired.  (Amended
Complaint ¶¶ 17b, 17d).  Links for daily sporting events were displayed under the "Today on Internet
TV" category header, and those links changed on a daily basis; links were added as the day progressed
and an event's start time drew closer.  (Id. at ¶ 17f).  When a user selected a link for a particular sporting
event under the "Today on Internet TV" category header, the type of link, the name of the broadcasting
station (e.g., ESPN), the language option, and the type of Internet media player were subsequently
displayed.  Users of the Rojadirecta website could simply click on a particular link to begin the process
of streaming to their own computer an illegal broadcast of a sporting event or Pay-Per-View event from
the third-party website that hosted the stream.  (Id. at ¶ 17g).  There is thus no question that the Amended
Complaint alleges that the Rojadirecta Domain Names facilitated these copyright infringement offenses.

---

      [8]     While there is an innocent owner defense to an in rem forfeiture action, it is an
affirmative defense and not one of the elements of the Government's case in the forfeiture action.  United
States v. Thibault, 897 F. Supp. 495, 498 (D. Colo. 1995).  The defense requires a property owner to
show that he lacked knowledge or failed to give consent to the illegal activity subjecting the property to
forfeiture.  Id.  To date, Puerto 80 has made no assertion that it is an innocent owner of the property that
is the subject of this civil action.  Moreover, in light of the numerous and repeated written notices
provided to Puerto 80 by the copyright holding sports leagues unequivocally asserting that the
Rojadirecta website was engaging in copyright infringing activity and requesting that the website cease
all authorized use of copyrighted content, (see Amended Complaint ¶¶ 19b, 21b), it is difficult to
envision how such an assertion could prevail.

14

Additionally, there can be no serious argument that the Government has alleged that the Rojadirecta Domain Names' facilitation of the underlying copyright offense was anything but substantial. See Amended Complaint ¶ 17d ("At all relevant times, the links displayed on the main homepage of the Rojadirecta Website were purposefully aggregated and organized by the owner(s) and/or operator(s) of the Rojadirecta Website. Moreover, more than half of the material available on the Rojadirecta Website at any given time during law enforcement's investigation appeared to be dedicated to making infringing content available to users of the Rojadirecta Website."); see also id. at ¶¶ 18-21 (illustrating law enforcement's repeated access to unauthorized broadcasts of live sporting events between December 2010 and January 2011).

Puerto 80's arguments about its own conduct are irrelevant and misapprehend the nature of the inquiry. The focus of the inquiry is on the role that the Rojadirecta Domain Names played in the commission of the alleged criminal offense.[9] As Justice Kennedy observed in his concurring opinion in United States v. Ursery, 518 U.S. 267 (1996), "[O]nly the culpable stand to lose their property; no interest of any owner is forfeited if he can show he did not know of or consent to the crime. . . . The theory is that the property, whether or not illegal or dangerous in nature, is hazardous in the hands of this owner because either he uses it to commit crimes, or allows others to do so. The owner can be held accountable for the misuse of the property." Id. at 294. Justice Kennedy continued, "Indeed, the

---

[9]       For this reason, the Court need not consider whether Puerto 80's aggregation of links to unauthorized material available elsewhere on the Internet makes it directly liable for copyright infringement, nor certify that question to the Second Circuit pursuant to 28 U.S.C. § 1292(b). (Puerto 80 Br. at 4-7, 22-23). The Government has already fully briefed why it believes such an interlocutory appeal to be improper, in any event. (See Docket Entry No. 38). Similarly, the rule of lenity has no application here. (Puerto 80 Br. at 15-17). There can be no serious argument that the statutes criminalizing the offenses upon which this forfeiture action is based — copyright laws that have been in effect for more than 30 years — contain a "grievous ambiguity." Chapman v. United States, 500 U.S. 453, 463 (1991) ("The rule of lenity . . . is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the [statute], such that even after a court has seized every thing from which aid can be derived, it is still left with an ambiguous statute." (internal citations and quotations omitted)).

Government will often file a forfeiture complaint without any knowledge of who the owner is.  True, the forfeiture statute requires proof of a violation of [a criminal statute], but the purpose of this predicate showing is just to establish that the property was used in a crime."  Id. at 296.  "[C]ivil in rem forfeiture actions do not require a showing that the owner who stands to lose his property interest has committed a criminal offense."  Id.  Thus, as the owner of the property at issue, Puerto 80's conduct is irrelevant, and the Amended Complaint more than sufficiently alleges that the defendant property facilitated the commission of criminal copyright infringement.[10]

## III.    PUERTO 80's REMAINING ARGUMENTS SHOULD BE WHOLLY REJECTED

Puerto 80 makes two additional arguments in support of its Motion – first, that the Government's seizure and forfeiture action are unconstitutional infringements of vital First Amendment rights; and second, that the allegations of the Amended Complaint are deficient because the copyright laws of the United States have no extraterritorial effect.  This Court should reject both claims.

### A.    The Government's Seizure of the Rojadirecta Domain Names Does Not Run Afoul of the First Amendment

Puerto 80 contends that the seizure of the Rojadirecta Domain Names runs afoul of the First Amendment's ban on prior restraints.  This contention is wholly without merit.  The Supreme Court has consistently upheld "the time-honored distinction between barring speech in the future and penalizing past speech" — a distinction "critical to our First Amendment jurisprudence."  Alexander v. United States, 509 U.S. 544, 553–54 (1993); accord Near v. Minnesota ex rel. Olson, 283 U.S. 697, 714–20 (1931) (distinguishing "previous restraint" from "subsequent punishment"; the latter is "appropriate remedy, consistent with constitutional privilege").  The danger of a prior restraint — and the reason it

---

[10]    In the event the Court disagrees, the Government respectfully requests leave to further amend its Amended Complaint.  See Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); see also McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (reiterating that whether to permit a plaintiff to amend his pleadings is a matter committed to the court's sound discretion).

receives "special emphasis" in First Amendment jurisprudence, Near, 283 U.S. at 714 — is that the speaker can be punished solely for violating an administrative or judicial order barring that speech, even if the content of the speech itself is protected: a prior restraint "permits sanctions to be imposed for failure to obtain the censor's approval, regardless of the nature of the expression. Expression may be punished in a censorship scheme upon proof of one fact — the failure to obtain prior approval." In re Halkin, 598 F.2d 176, 184 n.15 (D.C. Cir. 1979), abrogated on other grounds by Seattle Times Co. v. Rhinehart, 467 U.S. 20, 31 (1984); accord Near, 283 U.S. at 712–13 ("[F]urther publication is made punishable as a contempt. This is of the essence of censorship."); Lawson v. Murray, 515 U.S. 1110, 1114 (1995) (Scalia, J., concurring in denial of certiorari) ("The very episode before us illustrates the reasons for this distinction between remedial injunctions and unconstitutional prior restraints. . . . [T]he only defense available to the enjoined party is factual compliance with the injunction, not unconstitutionality."); see Lusk v. Village of Cold Spring, 475 F.3d 480, 485-87 & n.6 (2d Cir. Jan. 31, 2007) (defining prior restraint as "law requiring prior administrative approval of speech").

Where expression is conditioned on governmental permission, the First Amendment generally requires heightened procedural protections to guard against impermissible censorship. Freedman v. Maryland, 380 U.S. 51, 58 (1965); see id. at 54 (question is whether "danger of unduly suppressing protected expression" warrants procedural protections). However, prior-restraint regulations that operate less like "a censorship system" — such as regulations that do not engage in "direct censorship of particular expressive material," or where the government "does not exercise discretion by passing judgment on the content of any protected speech" — do not require "the full procedural protections set forth in Freedman." FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 228–29 (1990) (plurality opinion) (emphasis added; internal quotation marks omitted). In any event, where there is no prior restraint at all, Freedman's heightened procedural requirements do not apply. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 559 (1975) ("We held in Freedman . . . that a system of prior restraint runs afoul

17

of the First Amendment if it lacks certain safeguards" (emphasis added)); City News & Novelty, Inc. v.

City of Waukesha, 531 U.S. 278, 280–81 (2001) (describing Freedman's procedural requirements as

"guard[ing] against unconstitutional prior restraint of expression"; in Freedman, "expression [could not]

begin prepermission" (emphasis added)); Thomas v. Chicago Park Dist., 534 U.S. 316, 321 (2002)

(characterizing Freedman as averting dangers of licensing scheme); Waters v. Churchill, 511 U.S. 661,

687 (1994) (Scalia, J., concurring in judgment) ("Freedman . . . was . . . a prior restraint case; review and

requirement of procedures were to be expected.").

<strong>1.      The Government's Seizure Is Not a Prior Restraint</strong>

The Government's seizure of the Rojadirecta Domain Names, motivated not by a desire to limit

expression, but rather as an effort to combat the theft of intellectual property, is not a prior restraint in

violation of the First Amendment.  In Arcara v. Cloud Books, Inc., 478 U.S. 697 (1986), the Supreme

Court sustained a court order, issued under a general nuisance statute, that closed down an adult

bookstore that was being used as a place of prostitution and lewdness.  Specifically, in rejecting a claim

that the closure order amounted to an improper prior restraint on speech, the Supreme Court reasoned:

> The closure order sought in this case differs from a prior restraint in two
> significant respects. First, the order would impose no restraint at all on
> the dissemination of particular materials, since respondents are free to
> carry on their bookselling business at another location, even if such
> locations are difficult to find. Second, the closure order sought would
> not be imposed on the basis of an advance determination that the
> distribution of particular materials is prohibited — indeed, the
> imposition of the closure order has nothing to do with any expressive
> conduct at all.

478 U.S. at 705-06, n.2.  Here too, the seizure in no way imposes a restraint on particular materials, as

Rojadirecta's users remain free to carry on the chat aspect of the website via alternative domain names.

Moreover, the Government's seizure was not imposed based on an advance determination about any

expressive aspect of the Rojadirecta website.

18

Similarly, in Alexander, a case involving a First Amendment challenge to a forfeiture statute related to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the petitioner argued that the application of RICO's forfeiture provisions following his conviction on certain racketeering offenses constituted a prior restraint on speech and hence violated the First Amendment.  In rejecting petitioner's prior restraint claim, the Supreme Court noted that the "forfeiture order . . . does not forbid petitioner from engaging in any expressive activities in the future, nor does it require him to obtain prior approval for any expressive activities."  509 U.S. at 550-51.  Rather, unlike those traditional prior restraint cases, the forfeiture order in Alexander "impose[d] no legal impediment to — no prior restraint on — petitioner's ability to engage in any expressive activity he chooses."  509 U.S. at 551.  The Supreme Court noted that the petitioner was perfectly free to resume his adult entertainment business; but he could not finance that enterprise with assets derived from his racketeering activity.  Id. ("He is perfectly free to open an adult bookstore or otherwise engage in the production and distribution of erotic materials; he just cannot finance these enterprises with assets derived from his prior racketeering offenses"); cf. Arcara, 478 U.S. at 705 ("The severity of this [First Amendment] burden is dubious at best, and is mitigated by the fact that respondents remain free to sell the same materials at another location.").  Here, Rojadirecta's users remain free to express themselves in the chat forums found on the fully operational Rojadirecta website, which remains accessible on the Internet to this very day through alternative domain names.  Further, although Rojadirecta's users will be unable to access the links that present copyright issues via the Rojadirecta Domain Names, such a limitation does not present First Amendment issues.  See Harper & Row Publishers Inc. v. Nation Enterprises, 471 U.S. 539, 555-60 (1985) (copyright infringement is not protected by the First Amendment).  As such, the Government's seizure cannot be fairly characterized as a prior restraint.

2.      **Extraordinary Procedural Protections Are Required Only for Classic Prior Restraints**

Because the Government's seizure of the Rojadirecta Domain Names is not a prior restraint, it is not subject to the heightened procedural protections articulated in <u>Freedman</u> (nor is it even subject to the lesser procedures mandated by, <u>e.g.</u>, <u>City of Littleton</u> v. <u>Z.J. Gifts D-4, L.L.C.</u>, 541 U.S. 774, 781–84 (2004)). Relying on <u>Fort Wayne Books, Inc.</u> v. <u>Indiana</u>, 489 U.S. 46 (1989), Puerto 80 argues that a greater showing than probable cause is required to justify seizing the Rojadirecta Domain Names. (Puerto 80 Brief at 10). Puerto 80's reliance on this case is misplaced. The Supreme Court's imposition of procedural safeguards in <u>Fort Wayne Books</u> turned on the nature of the seizure, which was targeted at the books themselves because they were allegedly obscene. 489 U.S. at 51. In other words, to establish the criminal violation that led to the seizure, the state was required to delve into an inquiry related to the content of the books, <u>i.e.</u>, expression.[11] Here, however, the Government's seizure was occasioned by a violation of law unrelated to speech, namely, intellectual property theft, and thus did not implicate the same risks of content regulation that the presumptions of protection were designed to protect.

3.      **The Government's Seizure Survives Traditional First Amendment Scrutiny**

Puerto 80's argument that the Government's seizure also abridges the First Amendment rights of Internet users wishing to visit the website is similarly flawed. (Puerto 80 Brief at 17-20). The Government is allowed to stop crime. To the extent that the Government's seizure of the Rojadirecta Domain Names had an unintended and secondary impact on any speech rights — and there is nothing other than Puerto 80's bald assertions to suggest that there has been such an impact either on registered users of the Rojadirecta website or any other Internet user — First Amendment scrutiny would apply

---

[11]     To be sure, the Supreme Court's ruling in <u>Alexander</u> turned, in part, on there being more process than was afforded in the Government's obtaining of an <u>ex parte</u> warrant. However, <u>Alexander</u> involved a prohibition on obscenity, and thus raised concerns about Government infringement of presumptively protected materials. The instant seizure involves no similarly presumptively protected material.

"only where it was conduct with a significant expressive element that drew the legal remedy in the first place . . . , or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity." <u>Arcara</u>, 478 U.S. at 706-07.[12] Here, the instant seizure was directed at curtailing theft of valuable intellectual property on the Internet.  There is nothing expressive about illegal streaming.  Nor did the Government's actions single out those engaged in expressive activity.  The Government's seizure singled out domain names facilitating significant copyright infringement.  Moreover, like in <u>Alexander</u>, the seizure that Puerto 80 challenges involves the Government's application of a forfeiture statute that is wholly neutral as to expression.  <u>Alexander</u>, 509 U.S. at 551 ("The RICO forfeiture statute calls for the forfeiture of assets because of the financial role they play in the operation of the racketeering enterprise.  The statute is oblivious to the expressive or nonexpressive nature of the assets forfeited; books, sports cars, narcotics and cash are all forfeitable alike under RICO.").  The Government seized the Rojadirecta Domain Names pursuant to Sections 2323(a)(1)(A)-(B) and 981(b) of Title 18 — two provisions that are entirely neutral as to the nature of the assets that may permissibly be civilly forfeited.  <u>See</u> 18 U.S.C. § 981(b) ("[A]ny property subject to forfeiture to the United States . . . may be seized by the Attorney General . . . ."); 18 U.S.C. § 2323(a)(1)(A)-(B) ("The following property is subject to forfeiture to the United States Government: (A) <u>Any</u> article, the making or trafficking of which is prohibited under section 506 of title 17, or section . . . 2319 . . . of this title.  (B) <u>Any</u> property used, or intended to be used, in <u>any</u> manner <u>or</u> part to commit or facilitate the commission of an offense referred to in subparagraph (A).") (emphasis added).

---

[12]    The Second Circuit has rejected incidental-burden-on-expression arguments similar to those advanced here by Puerto 80 based on the Supreme Court's holding in <u>Arcara</u>. <u>See</u>, <u>e.g.</u>, <u>Church of American Knights of the Ku Klux Klan</u> v. <u>Kerik</u>, 356 F.3d 197, 209 (2d Cir. 2004) (concluding that New York's anti-mask statute was a conduct-regulating statute of general application that imposed an incidental burden on the exercise of free speech rights and did not implicate the First Amendment) (citing <u>Arcara</u>, 478 U.S. at 706).  Additionally, the Supreme Court has recently reiterated the more general point that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." <u>Sorrell</u> v. <u>IMS Health, Inc.</u>, 131 S. Ct. 2653, 2664-65 (2001).

However, even assuming this to be a case where an intermediate level of scrutiny is appropriate, the Government's actions here clearly satisfy the test articulated by the Supreme Court in United States v. O'Brien, 391 U.S. 367, 377 (1968) ("[W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.").

First, the Government's seizure was within its constitutional power and in furtherance of an important or substantial government interest, i.e., protecting the rights of copyright holders. The Constitution explicitly grants Congress authority to foster the  progress of science and creativity. U.S. Const., Art. I, § 8, cl. 8 ("Congress shall have Power ... [t]o promote the Progress of Science ... by securing [to Authors] for limited Times ... the exclusive Right to their ... Writings."); see also 321 Studios v. Metro Goldwyn Mayer Studios, Inc., 307 F. Supp. 2d 1085, 1101-02 (N.D. Cal. 2004) (recognizing the Government's substantial interest in copyright protection).

Second, the Government's interest in preventing copyright infringement is unrelated to the suppression of expression.  Courts have repeatedly upheld copyright restrictions against challenges that such limitations restrict speech.  See, e.g., Harper & Row Publishers Inc. v. Nation Enterprises, 471 U.S. at 555-60 (1985) (holding that the First Amendment does not shield against liability for copyright infringement); Universal City Studios, Inc. v. Corley, 273 F.3d 429, (2d Cir. 2001) (upholding the district court's granting of a preliminary injunction to copyright holder over First Amendment challenge); Universal City Studios, Inc. v. Reimerdes, 82 F. Supp. 2d 211, 221 (S.D.N.Y. 2000) (noting that to the extent there is any tension between free speech and protection of copyright, the Supreme Court has found it to be accommodated fully by doctrines such as fair use).

Finally, the incidental restriction on the alleged First Amendment freedoms of Rojadirecta and its users is no greater than is essential to the furtherance of the Government's compelling interests in preventing copyright infringement and the theft of valuable intellectual property. Particularly in light of the fact that its users are still free to access the Rojadirecta website via alternative domain names, any incidental First Amendment restrictions are no greater than necessary here. See Arcara, 478 U.S. at 706 ("It is true that the closure order in this case would require respondents to move their bookselling business to another location. Yet we have not traditionally subjected every criminal and civil sanction imposed through legal process to 'least restrictive means' scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction."). For these reasons, the Government's seizure survives traditional First Amendment scrutiny.

### B.    The Amended Complaint Sufficiently Alleges Infringing Acts in the United States

While it is well established that the copyright laws of the United States generally do not have extraterritorial effect, a claim under U.S. copyright law may arise for acts of infringement committed abroad "where those acts are permitted or initiated by predicate acts of infringement within the United States." Armstrong v. Virgin Records, Ltd., 91 F. Supp. 2d 628, 634 (S.D.N.Y. 2000). The Amended Complaint concerns itself with piracy of athletic event telecasts exclusively involving American sports leagues. (Amended Complaint ¶¶ 7, 18-21). It is thus inconceivable that a predicate act of infringement did not occur within the United States. Indeed, based on the nature of the sporting event broadcasts at issue, it is a fair inference drawn from the totality of the allegations of the Amended Complaint that many (if not all) of the third-party webpages to which the Rojadirecta website linked — and which themselves hosted infringing content — engaged in illegal copying of authorized broadcasts in the United States. (Id. at ¶¶ 6, 12, 13, 17g, 18, 20). Drawing all inferences in the light most favorable to the Government and construing its pleading liberally, the Amended Complaint sufficiently sets forth predicate acts of infringement within the United States.

Moreover, as one court in this District has noted, "[t]he factual issue of the existence of a predicate act in the United States cuts to the heart of the issue of jurisdiction under the Copyright Act for direct infringement.  According to the Second Circuit, 'in resolving claims that they lack jurisdiction, courts have acted in a fashion suggestive of [Rule] 56(f): they have required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party.'"  Well-Made Toy Mfg. Corp. v. Lotus Onda Industrial Co., Ltd., 2003 WL 42001, at *6 (S.D.N.Y. Jan. 6, 2003) (citing Kamen v. American Telephone & Telegraph Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).  The Government respectfully submits that to the extent there is any dispute regarding jurisdiction, the Government should be permitted discovery of facts relating to jurisdiction.  Indeed, the instant case invites the sort of inquiry into the existence of a jurisdictional fact that discovery will provide.  As such, dismissal of the Amended Complaint on this purported basis is not appropriate at this stage of the litigation.

**CONCLUSION**

For the foregoing reasons, Puerto 80's Motion should be denied in its entirety.  In the alternative, and in the event the Court finds the Government's pleading to be deficient, the Government respectfully requests leave to further amend.

Dated:  New York, New York
        April 16, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:     ___/s/ Christopher D. Frey_____
        Christopher D. Frey
        Andrew D. Goldstein
        Jean-David Barnea
        Assistant United States Attorneys
        One Saint Andrew's Plaza
        New York, New York 10007
        Tel.: (212) 637-2270/1559/2679
        Fax: (212) 637-2620